AVEMCO INSURANCE COMPANY, Hartford Life and Accident Insurance Company, HCC Life Insurance Company, The Ohio National Life Insurance Company and Pacific Life Insurance Company, Appellants–Defendants,

v.

STATE ex rel. Sally McCARTY, Commissioner of Insurance for the State of Indiana, Appellee–Plaintiff.

No. 49A02–0305–CV–410.

Court of Appeals of Indiana.

June 29, 2004.

Thomas J. Costakis, Lawrence W. Schmits, Randall R. Fearnow, Libby Y. Mote, Kreig & DeVault LLP, Indianapolis, IN, Attorneys for Appellants.

Steve Carter, Attorney General of Indiana, David L. Steiner, Deputy Attorney General, Wayne C. Turner, Anne L. Cowgur, Michael R. Limrick, McTurnan & Turner, Indianapolis, IN, Attorneys for Appellee.

Arend J. Abel, Cohen & Malad, LLP, Indianapolis, IN, Attorney for Amici Curiae, M Plan, Inc., et al.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Appellants–Defendants, Avemco Insurance Company, HCC Life Insurance Company, and Pacific Life Insurance Company (collectively, the "medical stop loss insurers"), appeal the trial court's Order granting Appellee–Plaintiff, State ex rel. Sally McCarty, Commissioner of Insurance for the State of Indiana (the Commissioner), complaint for preliminary injunction and entry of injunctive relief in her favor.[1]

We affirm.[2]

---

1. An Appellee–Intervenor, filed an Amici Curiae brief, which is substantially in line and in support of the Appellee–Plaintiff. The Amici are nineteen health insurers and health plans that are statutory members of the Indiana Comprehensive Health Care Association and, as such, are subject to assessment to cover Indiana Comprehensive Health Care Association's operating losses. Collectively, the Amici accounted for over $13.2 million of the Indiana Comprehensive Health Care Association's assessment in 2002.

2. Oral Argument was held on April 19, 2004 at the Indiana Court of Appeals' Courtroom. We commend each party for their preparation and presentation.

## ISSUES

The medical stop loss insurers raise three issues on appeal, which we consolidate and restate as the following three issues:

1. Whether the Commissioner exceeded her statutory authority when she issued the final orders compelling payment of assessments levied against the medical stop loss insurers by the Indiana Comprehensive Health Insurance Association (ICHIA);

2. Whether the trial court properly awarded the Commissioner injunctive relief pursuant to Indiana Code section 27–1–3–18, thereby ordering the medical stop loss insurers to comply with the Commissioner's final orders compelling payment of assessments levied against them by the ICHIA; and

3. Whether the assessments levied against the medical stop loss insurers by ICHIA are invalid and unenforceable because they were based upon a plan of operation that was not approved by the Commissioner following notice and hearing as required by I.C. § 27–8–10–2.1(c).

## FACTS AND PROCEDURAL HISTORY

The ICHIA is a not-for-profit entity that was created by statute in 1981 to "assure that health insurance is made available throughout the year to each eligible Indiana resident applying to [ICHIA] for coverage." See Ind.Code § 27–8–10–2.1. ICHIA is a legislatively created health insurance provider whose essential purpose is to provide health insurance coverage for certain high risk individuals in Indiana. Specifically, ICHIA insures Indiana residents who, as a result of their chronic and/or catastrophic illnesses have: 1) been refused coverage by at least one private insurer; 2) have one of several catastrophic illnesses automatically qualifying them for ICHIA coverage; or 3) would otherwise be able to obtain insurance only at a price higher than ICHIA's premium rate or with material underwriting restrictions. See I.C. § 27–8–10–5.1(b). ICHIA currently insures approximately 9,700 Indiana residents who, without the ICHIA program, would be unable to obtain health insurance because, by definition, ICHIA participants cannot obtain insurance in the private health insurance market.

All companies "providing health insurance or health care services in Indiana" are required to be members of ICHIA as a condition of doing such business in the State. See I.C. § 27–8–10–2.1(a). "Health insurance" for purposes of defining ICHIA's membership "means hospital, surgical and medical expense incurred policies." See I.C. § 27–8–10–1(p). The medical stop loss insurers are self-described medical stop loss insurance companies that issue policies to cover "liability for medical expenses incurred by ... employees in excess of a pre-determined attachment point." (Appellants' App. p. 9). These insurers pay medical expenses incurred by individuals within the scope of their insurance policies after those expenses exceed the "predetermined attachment point." Id. The Indiana Department of Insurance has issued each of these medical stop loss insurers a certificate of authority to engage in the business of health insurance in Indiana.

ICHIA exercises its powers through a Board of Directors (Board) and operates under a plan of operation established by its Board and approved by the Commissioner. ICHIA must submit to the Commissioner a plan of operation necessary or suitable to assure the "fair, reasonable, and equitable administration of the association" and which "provides for the sharing of association losses on an equitable, proportionate basis among the member carri-

ers, prepaid health care delivery plans, and self-insurers." *See* I.C. § 27–8–10–2.1(c). The plan of operation becomes effective only upon approval in writing by the Commissioner. The Commissioner is charged with the enforcement, administration, and execution of all statutes applicable to insurance companies licensed to do business in the State. In addition to this general authority, the Commissioner is a statutory member of the Board, and has final authority over ICHIA's power to assess its members to recoup its operating losses.

The premiums ICHIA may charge to its insured are limited by statute. These statutorily capped premiums do not generate enough revenue to cover the cost of the high-dollar claims incurred by ICHIA's insured. Thus, because it is statutorily required to charge "reasonable rates" for the insurance it provides, ICHIA has historically generated losses rather than profits. It recoups these losses by assessing its members.[3] Specifically, "[a]ny net loss shall be assessed by the association to all members in proportion to their respective shares of total health insurance premiums received in Indiana during the calendar year ... or any other equitable basis as may be provided in the plan of operation." *See* I.C. § 27–8–10–2.1(g).

Although the statute provides that the final assessment of members must occur following the close of the fiscal year, the statute also authorizes "interim assessments against members of the association if necessary to assure the financial capability of the association to meet the incurred or estimated claims expenses or operating expenses of the association until the association's next fiscal year is completed." *See*

I.C. § 27–8–10–2.1(g). Interim assessments are adjusted as necessary from one interim period to the next based on changes in facts and circumstances. ICHIA depends on its members' payment of assessments, including interim assessments, to stay in operation and to provide the required healthcare coverage for its participants.

Following the close of the fiscal year, ICHIA issues to members a final, "true-up" assessment based on the actual, final operating results for the fiscal year. (Appellees' Br. p. 7). In the "true-up," each member's portion of the actual, total losses for the year is billed to that member, and ICHIA applies credit against the billed amount for all interim payments made during that year.

The medical stop loss insurers in this case provide stop loss insurance to employers in Indiana that sponsor self-insured or self-funded health care plans on behalf of eligible employees. With a self-insured or self-funded plan, "the employer is in essence the insurance company[;] they assume the liabilities for the health plan they offer to their employees." (Appellants' App. p. 542). The medical stop loss insurers make all payments directly to the employer; they play no role in the administration of employee claims and have no authority to manage the self-funded health plan.

Until 2002, the ICHIA Board calculated assessments on the basis of carriers' premium revenues. In August of 2001, the Board changed the assessment methodology to a formula based on claims paid by the member insurers, under which the medical stop loss insurers were to be as-

---

**3.** The ICHIA currently assesses its members three times a year. Interim I, II, and III assessments are issued in March, July, and November, respectively. The interim assessments are based on projections of what IC-HIA believes its net losses will be for that year. ICHIA then issues "true-ups" in July of the following year once the actual losses of the previous year have been determined. (Appellant's App. pp. 467, 510–11).

sessed based on the claims underlying and leading up to the stop loss coverage attachment point. This "claims paid" assessment methodology was not successfully implemented because the medical stop loss insurers contended that the necessary data was not available to them. (Appellant's App. p. 12). In response, ICHIA adopted a covered lives or "headcount" assessment methodology, which apportions ICHIA losses on the basis of each member's share of the Indiana healthcare insurance market as represented by the number of persons for whom medical expenses incurred were a potential liability under that member's policies. (Appellants' App. p. 11).

When the Board amended the Plan of Operation to change the assessment methodology, it specified that a medical stop loss carrier's covered lives included individuals covered under a group health plan maintained by a self-insurer to the extent the medical stop loss insurer had contracted to reimburse the plan or the self-insurer for medical expenses incurred with respect to such individuals. The ICHIA members submitted information concerning the number of covered lives or individuals.

The Commissioner approved this amendment to the Plan of Operation to change the assessment methodology, both in her capacity as a Board member and, then, in her capacity as Commissioner. In addition, in March of 2003, the Commissioner *sua sponte* gave notice and held a hearing, and after a period for submission of written comments, she again approved the current Plan of Operation. The Commissioner further stated that the amendments adopted by the ICHIA Board and reflected in the revised Plan of operation had only prospective effect and could not be applied retroactively.

On November 15, 2002, ICHIA issued interim assessments to its members, in-cluding an assessment to the medical stop loss insurers. In particular, ICHIA issued assessments to Avemco Insurance Company for $1,119,955.83, and to HCC Life Insurance Company for $2,680,938.04. These assessments reflect a significant increase above assessments received by the medical stop loss insurers under the former premium-based methodology. As a result, the medical stop loss insurers refused to pay the November 2002 interim assessments. The medical stop loss insurers were joined in their refusal to pay by other medical stop loss insurers who are not participating in this appeal, resulting in a $7,607,531 shortfall in ICHIA's cash flow, which is approximately 20 percent of the total interim assessment to all members of ICHIA for November 2002.

In December and January of 2002, the medical stop loss insurers (and others) filed petitions for administrative review before ICHIA to challenge the November 2002 interim assessments. In their petition, they claimed: 1) that the medical stop loss carriers are not members of ICHIA and are, therefore, not subject to assessments; and 2) the method used by the ICHIA Board and approved by the Commissioner to issue assessments (and/or the actual amounts of their assessments) is not equitable. The medical stop loss insurers refused to pay their assessments, even under protest, pending the administrative decision on their petitions and the completion of judicial review of that decision.

The resulting shortfall in ICHIA's anticipated and required cash flow detrimentally affected ICHIA insureds and their medical care providers by requiring the temporary suspension of payment of high-dollar claims. The medical stop loss insurers' refusal to pay presented an imminent threat to ICHIA's ability to continue operations and fulfill its statutory obligation to provide insurance to otherwise

uninsurable Indiana residents. These problems were exacerbated by the stop loss insurers' (and other stop loss carrier members') refusal to pay an additional $4,000,000 under the first interim assessment of 2003. As a result, ICHIA is faced with the possibility of insolvency.

On February 12, 2003, pursuant to I.C. § 27–1–3–19, the Commissioner issued orders to twelve stop loss insurers, including the medical stop loss insurers, requiring them to pay their outstanding ICHIA assessments. The Orders required immediate payment of the ICHIA assessments, despite the pending appeals, based on the Commissioner's determination that the medical stop loss insurers' refusal and failure to pay the ICHIA assessments: (1) was a violation of I.C. § 27–8–10–2.1(g), which requires ICHIA members to pay the costs of funding the ICHIA program; (2) created an unlawful disparity in competition in violation of I.C. § 27–4–1–8, because other ICHIA members, including other medical stop loss insurers, were paying their assessments; and (3) threatened ICHIA's solvency and ability to pay claims for its insureds. Based on these findings, the Commissioner invoked her authority under I.C. § 27–1–3–19, and ordered that each of the stop loss insurers cease its violations of Indiana insurance law by "immediately pay[ing] the assessment[s] due and payable to ICHIA." (Appellants' App. p. 16).[4]

In response, about half of the stop loss insurers who received the Commissioner's February 12, 2003 Orders paid their overdue assessments, under protest, without waiving their rights to continue challenging the amounts of the assessments and to seek refunds or other relief through the administrative determination, and any subsequent judicial review. However, the medical stop loss insurers involved in this case continued their refusal to pay.

On March 10, 2003, the medical stop loss insurers filed a Verified Petition for Judicial Review of the Commissioner's Final Orders and a Verified Motion for Preliminary Injunction against the Commissioner and the Department of Insurance in the Marion Superior Court, to prevent enforcement of the Commissioner's Final Orders pending adjudication on the merits of the November 2002 Assessments (the "Superior Court action"). On March 13, 2003, pursuant to I.C. § 27–1–3–19(c), the Commissioner filed a Complaint for Preliminary and Permanent Injunction against the medical stop loss insurers in the Marion Circuit Court (the "trial court"), seeking to enforce her February 12 Orders and demanding payment of the November 2002 assessments. The Superior Court action was ultimately transferred to and consolidated with the trial court action on April 17, 2003. On March 27, 2003, the trial court granted ICHIA's Motion to Intervene in these proceedings.

On March 28, 2003, the medical stop loss insurers filed an Amended Verified Motion for Preliminary Injunction in the trial court. The parties agreed that the medical stop loss insurers' Amended Verified Motion for Preliminary Injunction would be treated as a cross-motion for preliminary injunction and that both this motion and the Commissioner's Complaint for Preliminary Injunction would be heard simultaneously at the evidentiary hearing.

---

4. In the February 12 Orders, the Commissioner did not determine whether the assessment was equitable or correctly applied to all members, and did not intend to moot the pending administrative challenges. Rather, the Orders were premised solely on her determination that the law and the threat to ICHIA's solvency required ICHIA members to pay the ICHIA assessments, even pending the final resolution of an administrative challenge to those assessments.

On March 31, 2003, the trial court entered an Order granting this stipulation.

On April 10, through April 11, 2003, an evidentiary hearing on the Commissioner's Complaint for Preliminary Injunction and the medical stop loss insurers' Amended Verified Motion for Preliminary Injunction was held. At the hearing, the trial court heard evidence on the cross-motions for preliminary injunction. On April 14, 2003, the trial court entered its Findings of Fact, Conclusions of Law and Preliminary Injunction Order. In this Order, the trial court concluded that the Commissioner had satisfied all four of the requirements for injunctive relief (although she was excused from satisfying most of them by operation of the per se rule and I.C. § 27–1–3–19(c)), including demonstrating a reasonable likelihood of success on the merits. The trial court granted the Commissioner's Motion for Preliminary Injunction and ordered the medical stop loss insurers to "pay the November 15, 2002 ICHIA assessments, and any subsequent assessments ... subject to a final administrative or judicial determination of the issues raised in their petitions for administrative review now pending before ICHIA." (Appellants' App. pp. 35–6). As a result, the medical stop loss insurers complied with the injunction and paid the assessments.

The medical stop loss insurers now appeal this portion of the trial court's Order. The trial court also denied the medical stop loss insurers' motion for preliminary injunction; however, the medical stop loss insurers do not appeal that portion of the Order. Additional facts will be supplied as necessary.

## DISCUSSION AND DECISION

### I. Commissioner's Authority

■ First, the medical stop loss insurers argue that the Commissioner exceeded her statutory authority when she issued the Final Order compelling payment of the November 2002 assessments and sought to enforce the Order in a preliminary injunction action. Conversely, the Commissioner maintains that she is statutorily authorized to issue and enforce the Final Order in a preliminary injunction action.

■ Resolution of this issue requires this court to construe four statutes: I.C. § 27–8–10–2.1(e)(2); I.C. § 27–8–10–2.1(g); I.C. § 27–1–3–19; and I.C. §§ 27–1–1–2, 3. The interpretation of a statute is a legal question that is reviewed de novo. *Golden Rule Ins. Co. v. McCarty*, 755 N.E.2d 1104, 1106 (Ind.Ct.App.2001). Statutory interpretation is the responsibility of the court and within the exclusive province of the judiciary. *Id.; Miller Brewing Co. v. Bartholemew County Beverage Co.*, 674 N.E.2d 193, 200 (Ind.Ct.App.1996). The first and often the last step in interpreting a statute is to examine the language of the statute. *Id.* When confronted with an unambiguous statute, we do not apply any rules of statutory construction other than to give the words and phrases of the statute their plain, ordinary, and usual meaning. *Id.; Poehlman v. Feferman*, 717 N.E.2d 578, 581 (Ind.1999).

Here, the medical stop loss insurers contend that the trial court's reliance upon Indiana Code section 27–1–3–19, in permitting such an action by the Commissioner, was improper. Indiana Code section 27–1–3–19, states, in pertinent part:

(a) Whenever the commissioner determines that any insurance company to which this article is applicable:

(1) is conducting its business contrary to law or in an unsafe or unauthorized manner;

(2) has had its capital or surplus fund impaired or reduced below the amount required by law; or

(3) has failed, neglected, or refused to observe and comply with any order or rule of the department or commissioner;

then the commissioner may, by an order in writing addressed to the board of directors, board of trustees, attorney in fact, partners, or owners of or in any such insurance company, to direct the discontinuance of any such illegal, unauthorized, or unsafe practice, the restoration of an impairment to the capital or the surplus fund, or the compliance with any such law, order, or rule of the department or commissioner.

(b) If the insurance company fails, neglects, or refuses to comply with the terms of that order within thirty (30) days after its receipt by the insurance company, or within a shorter period set out in the order if the commissioner determines that an emergency exists, the commissioner may, in addition to any other remedy conferred upon the department or the commissioner by law, bring an action against any such insurance company, its officers, and agents to compel that compliance.

(c) The action shall be brought by the commissioner in the Marion County circuit court. The action shall be commenced and prosecuted in accordance with the Indiana Rules of Trial Procedure, and relief for noncompliance of the order includes any remedy appropriate under the facts, including injunction, preliminary injunction, and temporary restraining order.

*See* I.C. § 27–1–3–19.

The medical stop loss insurers now claim that this "generalized" power conferred upon the Commissioner by Indiana Code section 27–1–3–19, must also be read in conjunction with the ICHIA statute. The ICHIA statute found in Indiana Code section 27–8–10–2.1(g), states, in pertinent part, that all assessments "must be determined by the board members" of ICHIA in accordance with the ICHIA statute. Based upon this statute, the medical stop loss insurers contend that the Commissioner does not have the authority to collect assessments lawfully owed by the members of ICHIA; rather, this power is granted exclusively to ICHIA.

■ However, we find the medical stop loss insurers argument unavailing. In particular, Indiana Code section 27–8–10–2.1(g) states that the assessments are subject to final approval by the Commissioner. *See* I.C. § 27–8–10–2.1(g) ("[a]ssessments must be determined by the board members specified in subsection (b)(1), subject to final approval by the commissioner). Thus, the Commissioner is vested with the broad power and authority of the State to compel compliance with Indiana's insurance laws. *See* I.C. §§ 27–1–1–1, 27–1–1–2.[5] Accordingly, since the medical stop

---

**5.** Indiana Code section 27–1–1–1, states, in pertinent part:

Section. 1. There is hereby created a department in the state government of the state of Indiana which shall be known as the department of insurance. Said department shall have charge of the organization, supervision, regulation, examination, rehabilitation, liquidation, and/or conservation of all insurance companies to which this title is applicable, shall have charge of the enforcement, administration, and execution of the provisions of this title and the provisions of any other statute applicable to insurance companies, to the insurance department, or to the insurance commissioner, and shall exercise such other powers and perform such other duties as may at any time be imposed or conferred on the department by law. Whenever by any of the provisions of any statute any right, power, or duty is imposed or conferred on the department, the right, power, or duty so imposed or conferred shall be

loss insurers are engaging in the health insurance business in the State of Indiana pursuant to certificates of authority issued by the Indiana Department of Insurance, the statute clearly mandates that the Commissioner has the authority to issue assessments to them. *See id.*

■ Thus, our plain reading of the statute mandates that approval of all ICHIA assessments is within the province of the Commissioner. *See Golden Rule Ins. Co.,* 755 N.E.2d at 1106. Therefore, we conclude that the Commissioner did not exceed her statutory authority in issuing the Final Order to the medical stop loss insurers compelling payment of the November 2002 Assessments. *See* I.C. §§ 27–8–10–2.1(g); 27–8–10–2.1(c). Consequently, the Commissioner had the statutory authority to enforce the Order in a preliminary injunction action.

## II. *Preliminary Injunction*

Next, the medical stop loss insurers argue that the trial court erred in granting the Commissioner a preliminary injunction. Specifically, the medical stop loss insurers claim that the Commissioner failed to satisfy all of the elements required to obtain injunctive relief. Conversely, the Commissioner maintains that the trial court properly awarded her injunctive relief, as all elements were satisfied.

### A. *Standard of Review*

■ The granting of a preliminary injunction is within the discretion of the trial court, and this court's review is limited to the determination of whether or not the trial court clearly abused that discretion. *Norlund v. Faust,* 675 N.E.2d 1142, 1149 (Ind.Ct.App.1997). When determining whether or not to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. *Id.;* Ind. Trial Rule 52(A). When findings and conclusions are made, the reviewing court must determine if the trial court's findings support the judgment. *Id.* The judgment will be reversed only when clearly erroneous, *i.e.,* when the judgment is unsupported by the findings and the conclusions entered on those findings. *Id.; DeHaan v. DeHaan,* 572 N.E.2d 1315, 1320 (Ind.App.1991). Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. To determine whether the findings or judgment are clearly erroneous, we consider the evidence only in the light most favorable to the judgment. *Id.* We also construe the findings liberally in favor of the judgment. *Id.; Barlow v. Sipes,* 744 N.E.2d 1, 5 (Ind.Ct.App.2001).

■ When considering the grant or denial of a preliminary injunction, the trial court's discretion is measured by several factors. *Id.* These factors include:

1) Whether or not the party seeking the injunction has an adequate remedy at law;
2) Whether granting the injunction would disserve the public interest;
3) Whether the party has established a reasonable likelihood of success at trial; and

possessed and exercised by the insurance commissioner, unless otherwise provided in that statute, or unless any such right, power, or duty is delegated to the duly appointed deputies, assistants, or employees of the department, or any of them, by an appropriate rule or order of the insurance commissioner.

Indiana Code section 27–1–1–2, states, in pertinent part:

Sec. 2. The powers, duties, management and control of the department of insurance are hereby conferred on and vested in the "insurance commissioner."

4) Whether the injury to the party seeking the injunction outweighs the harm to the party who would be enjoined.

*Id.; Indiana State Bd. of Public Welfare v. Tioga Pines Living Center, Inc.*, 637 N.E.2d 1306, 1311 (Ind.App.1994), *reh'g denied; Barlow*, 744 N.E.2d at 5.

 A party seeking a preliminary injunction must establish a prima facie case at the preliminary injunction hearing. *Id.* The party is not required to show that he is entitled to relief as a matter of law, nor is he required to prove and plead a case, which would entitle him to relief upon the merits. *Id.* Consequently, this court, in reviewing the decision of the trial court, must determine "whether the likelihood of success is so improbable as to render the trial court's determination erroneous as a matter of law." *Id.*

### B. *Per Se Standard of Review*

In this case, the trial court held that the Commissioner was entitled to injunctive relief pursuant to Indiana Code section 27–1–3–19, and under the principles of *Union Insurance Co. v. State ex rel. Indiana Department of Insurance*, 401 N.E.2d 1372 (Ind.Ct.App.1980). Having found that the Commissioner demonstrated a likelihood of success; the court relied on a "per se" rule under which the other elements of the standard injunction analysis were presumed.

As a result, the medical stop loss insurers claim that the trial court abused its discretion in granting the Commissioner mandatory injunctive relief as a matter of right under Indiana Code section 27–1–3–19 or the "per se" rule. Specifically, the medical stop loss insurers contend that the trial court erred by granting the Commissioner injunctive relief because the Commissioner was required to satisfy all of the elements for injunctive relief, which the

medical stop loss insurers allege were not satisfied.

 This court has indicated that a relaxed standard may sometimes be applied for clear, uncontested unlawful conduct. *Indiana Family and Social Services Admin. v. Walgreen Co.*, 769 N.E.2d 158, 162 (Ind.2002); *Schrenker v. Clifford*, 270 Ind. 525, 529, 387 N.E.2d 59, 61 (Ind. 1979). But because parties are relieved of several showings usually necessary to obtain injunctive relief, this relaxed standard "is only proper when it is clear that [a] statute has been violated." *Id.* (quoting *Union Township Sch. Corp. v. State ex rel. Joyce*, 706 N.E.2d 183, 192 (Ind.Ct.App. 1998)).

In prior Indiana decisions employing the relaxed standard, the "per se" rule has been used to enjoin activity that is clearly unlawful and against the public interest. *See id.* The "per se" rule has never been used to permit a private party to enjoin state action based on an alleged procedural deficiency in promulgating rules. *Id.* A private assertion of public interest will rarely justify enjoining state conduct when it is based only on a procedural challenge and a *prima facie* case. *Id.*

Here, the medical stop loss insurers assert that the trial court was mistaken in the grounds it relied upon in granting the Commissioner injunctive relief. As mentioned above, the trial court relied upon Indiana Code section 27–1–3–19(c) and *Union Insurance Co.* in issuing its holding. Indiana Code section 27–1–3–19(c), provides, in pertinent part:

The action shall be brought by the commissioner in the Marion County circuit court. The action shall be commenced and prosecuted in accordance with the Indiana Rules of Trial Procedure, and relief for noncompliance of the order includes any remedy appropriate under

the facts, including injunction, preliminary injunction, and temporary restraining order.

The medical stop loss insurers claim that the statute does not confer upon the Commissioner the right to injunctive relief as a matter of law; rather, the ability to seek injunctive relief as may be warranted by the facts of the particular case. In essence, the medical stop loss insurers argue that the Commissioner should have been required to satisfy all the necessary elements, based upon the facts of this case.

Similarly, the medical stop loss insurers argue that *Union Insurance* does not support the proposition that Indiana Code section 27–1–3–19 completely relieves the Commissioner of her obligation to establish any of the elements of a preliminary injunction. In *Union Insurance* the State commenced a suit against an insurer for a mandatory injunction, based upon a claim that the charter upon which the insurer based its existence had expired, thereby requiring the insurer to comply with the regulations of the Indiana Department of Insurance. *See Union Ins. Co.*, 401 N.E.2d at 1375.

In *Union Insurance*, this court concluded that the governing statute, Indiana Code section 27–1–3–19, is rather specific and authorizes the State to seek a mandatory injunction if it believes an insurance company is engaging in illegal practices. *Id.* Particularly this court stated, "the legislature has declared that if an insurance company is engaged in any of the prohibited practices, there is no adequate legal remedy and irreparable injury exists as a matter of law." *Id.* No separate proof or finding of these elements need be made. It is within the power of the Indiana General Assembly to modify common law rules and remedies." *Id.*

Based upon this ruling, the medical stop loss insurers argue that the Commissioner failed to establish clear, uncontested, unlawful conduct by the medical stop loss insurers to support the application of the per se rule as it is expressed either in the common law or Indiana Code section 27–1–3–19. Specifically, because the medical stop loss insurers' status as members of ICHIA subject to assessment was highly contested, and the legality of the November 2002 Assessments and Plan of Operation upon which they were based was in question, the medical stop loss insurers maintain that the Commissioner was not entitled to the presumptions afforded by Indiana Code Section 27–1–3–19 or the per se rule.

However, we find the medical stop loss insurers arguments moot. In particular, the record reflects that the trial court properly recognized that Indiana Code section 27–1–3–19 and the "per se" rule relieved the Commissioner of the burden of establishing anything more than a likelihood of success on the merits. Despite this, the record reveals that the trial court proceeded to determine that the remaining elements of the traditional preliminary injunction analysis were amply satisfied. Therefore, we will review the trial court's finding on each of the elements of preliminary injunction in a separate analysis below.

### C. *Elements Required for Injunctive Relief*

#### i. *Adequate Remedy at Law*

■ First, the trial court was required to examine whether or not the party seeking the injunction, *i.e.*, the Commissioner, has an adequate remedy at law. Our review of the record discloses that the trial court issued the following findings of fact regarding this element:

24. The testimony of the [medical stop loss insurers] clearly showed that, absent an injunction requiring payment,

the [medical stop loss insurers] will not pay any future ICHIA assessments pending the final resolution of their administrative challenges to the assessments, including any judicial review of those assessments.

\* \* \*

26. [The medical stop loss insurers] failure and refusal to pay the November 2002 assessments has resulted in a shortfall of about $7,500,000 from ICHIA's anticipated and required cash flow. Ann Bingman, a representative of ICHIA's administrator and a witness for the Commissioner, demonstrated that[,] without payment of the amounts owed by the stop loss carriers, ICHIA will not have sufficient cash flow to continue operations beyond about May 2003.

27. Bingman also showed that the cash flow shortage resulting from the [medical] stop loss insurers' refusal to pay the November 2002 assessment has already begun to affect ICHIA participants and their medical care providers by requiring the temporary suspension of payment of certain high-dollar claims.

28. On February 26, 2003, ICHIA sent the first of the 2003 Interim Assessments to its members, including the [medical stop loss insurers]. Amounts owed by the [medical stop loss insurers] for February 2003 total approximately $4,000,000. [The medical stop loss insurers] are also refusing to pay the February 2003 assessments. The evidence showed that [the medical stop loss insurers] continue to maintain that they are not ICHIA members and, without an injunction requiring them to pay, will refuse to pay any portion of their ICHIA assessments until there is a final adjudication of their challenges.

29. The Commissioner's witnesses testified that ICHIA cannot avoid its immi-

nent cash flow crisis by reassessing those members who are currently paying ICHIA assessments for the amounts owed by [the medical stop loss insurers]. ICHIA is required by statute to assess all members. Unless it amends it Plan of Operation, it is required to assess on the basis of the headcount methodology. And, as shown in testimony from the executive director of ICHIA, the members who are currently paying are likely to refuse to pay the share of other members in addition to their own, which will lead to additional administrative challenges and refusals to pay.

(Appellant's App. pp. 14–5).

Based upon these findings, the trial court evaluated and determined that it was not practical, efficient, or in the interest of justice to allow ICHIA to become insolvent and unable to fulfill its statutory obligations. Based upon the evidence before us, we cannot say that the trial court's decision was clearly erroneous, or unsupported by the findings. *See Norlund*, 675 N.E.2d at 1149. Consequently, we find that the trial court properly determined that the Commissioner has an adequate remedy at law.

ii. *Public Interest*

Next, the trial court was required to determine whether granting the injunction would disserve the public interest. In deciding to issue the injunction, the trial court issued the following findings of fact regarding this element:

3. Without the ICHIA program, more than 9,700 Indiana residents would be unable to obtain health insurance. By definition, ICHIA participants cannot obtain insurance in the private health insurance market. Commissioner's witness Michelle Rice showed by example that if the ICHIA programs were no longer available, the result would be that ICHIA participants, with life threaten-

ing diseases requiring critical medical care, would be forced to withdraw from the workforce and bankrupt themselves to qualify for Medicaid and receive the needed treatment.

\* \* \*

5. The General Assembly anticipated ICHIA's operating losses, and directed ICHIA to assess them among its member insurance providers. Ind.Code § 27–8–10–2.1(g).

\* \* \*

34. In the ICHIA statute, the legislature provided that assessments to members must be determined in the year *after* the losses are incurred—for example, assessments must be made at some point during 2003 for net losses incurred in 2002. Ind.Code § 27–8–10–2.1(g) states: "Following the close of the association's fiscal year ... any net losses shall be assessed by the association to all members...." The statute also does not preclude, and fully allows, assessment under a Plan and method established when the final assessing is done, that is, in the year "following" the fiscal year in which the net losses are incurred.

\* \* \*

38. The laws promulgated by the General Assembly reflect its determination of what is in public interest. *State v. Vore,* 268 Ind. 340, 343, 375 N.E.2d 205, 207 ( [Ind.] 1978). The General Assembly has determined that it wants insurance to be available to Indiana residents who would otherwise be uninsurable. Ind.Code § 27–8–10–2.1(g). The General Assembly has also determined that it wants those who benefit through profits from the health insurance market in this state to share the costs of providing insurance to the otherwise uninsurable. Ind.Code § 27–8–10–2.1(g). And, the General Assembly has determined that the Commissioner must have the power to order insurance companies doing business in Indiana to comply with Indiana laws, and to seek injunctive relief to compel compliance with those orders. Ind.Code § 27–3–1–19. Entry of a preliminary injunction for the Commissioner will serve the public interest by fulfilling each of these statutory goals.

(Appellant's App. pp. 6, 8, 34). As a result, the trial court concluded that the General Assembly intends that: 1) insurance be available to Indiana residents who would otherwise be uninsurable; 2) those who profit by insuring the incurred medical expenses of Indiana residents must fund the ICHIA program; and 3) the Commissioner must have the power to order insurance companies doing business in Indiana to comply with the law. Again, we find that the evidence before the trial court amply supports its findings and conclusion. *See Norlund,* 675 N.E.2d at 1142.

In the present case, the record shows that trial court was guided by the ICHIA statute and properly concluded that the public interest would be served by the entry of the preliminary injunction. More specifically, the record shows that over 9,700 Indiana residents would continue to receive health insurance that otherwise would not be available to them. Therefore, we conclude that the trial court properly considered the public's interest by granting the injunctive relief. *See id.*

### iii. *Likelihood of Success at Trial*

■ Further, the medical stop loss insurers argue that the trial court erred in concluding that the Commissioner demonstrated a likelihood of success on the underlying merits of the November 2002 Assessments to support her Complaint for

Preliminary Injunction enforcing those assessments. Particularly, the medical stop loss insurers allege that the satisfaction of this element depends upon whether the medical stop loss insurers are member carriers of ICHIA and subject to lawful assessments. Conversely, the Commissioner asserts that based upon the ICHIA statute, the medical stop loss insurers have been and continue to be statutory members of ICHIA.

The goal of statutory construction is to determine, give effect to, and implement the intent of the legislature. *N.D.F. v. State*, 775 N.E.2d 1085, 1088 (Ind.2002). When interpreting the words of a single section of a statute, this court must construe them with due regard for all other sections of the act and with regard for the legislative intent to carry out the spirit and purpose of the act. *Id.; Park 100 Dev. Co. v. Ind. Dep't of State Revenue*, 429 N.E.2d 220, 222–23 (Ind.1981). Further, we will not read into the statute that which is not the expressed intent of the legislature. *Id.; Ind. Civil Rights Comm'n v. Indianapolis Newspapers, Inc.*, 716 N.E.2d 943, 946 (Ind.1999). As such, it is just as important to recognize what the statute does not say as it is to recognize what it does say. *Id.; Clifft v. Ind.*

*Dep't of State Revenue*, 660 N.E.2d 310, 316 (Ind.1995).

Indiana Code section 27–8–10–2.1(a), states, in pertinent part, "[a]ll carriers, health maintenance organizations, limited health maintenance organizations and self-insurers providing health insurance or health care services in Indiana must be members of [ICHIA]." Under the statute, " 'health insurance' means hospital, surgical, and medical expense incurred policies." *See* I.C. § 27–8–10–1(p). A "carrier" is any insurer providing such policies. *See* I.C. § 27–8–10–1(d).

In the instant case, we find that the medical stop loss insurers are members of ICHIA, by the definition of their business. Specifically, the medical stop loss insurers insure for medical expenses incurred by individuals within the scope of their policies. Additionally, the record discloses that the medical stop loss insurers have all applied for and received certificates of authority to engage in the business of health insurance in this state and report health premiums to the Indiana Department of Insurance.

Nevertheless, the medical stop loss insurers cite to *Associated Industries of Missouri v. Angoff*, 937 S.W.2d 277 (Mo. Ct.App.1996) to support their argument.[6]

---

**6.** We note that, the medical stop loss insurers cite to several cases in other jurisdictions that involve stop loss insurers, however, they are irrelevant to the specific issue in this particular case. Specifically, the cases do not determine whether stop loss insurers are considered health insurance carriers that can be regulated under state statute. *See Cuttle v. Federal Employees Metal Trades Council*, 623 F.Supp. 1154 (D.Maine 1985); *United Food & Commercial Workers & Employers Arizona Health & Welfare Trust v. Pacyga*, 801 F.2d 1157, 1161 (9th Cir.1986); *Brown v. Granatelli*, 897 F.2d 1351, 1355 (5th Cir.1990); *Thompson v. Talquin Bldg. Prods. Co.*, 928 F.2d 649, 653 (4th Cir.1991); *American Med. Security, Inc. v. Bartlett*, 111 F.3d 358, 360 (4th Cir.1996). Therefore, we find the medi-

cal stop loss insurers' reliance upon these cases misplaced. In particular, the question confronting the courts in the preemption cases involve either: 1) whether the purchase of stop loss insurance by employee benefit plans alters the preemption analysis under ERISA, *see, e.g., Bill Gray Enters., Inc. v. Gourley*, 248 F.3d 206, 215 (3d Cir.2001); or 2) the extent to which states may indirectly regulate ERISA plans. *See, e.g. Travelers Ins. Co. v. Cuomo*, 14 F.3d 708, 718 (2d Cir.1993), *rev'd by* 514 U.S. 645, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995); *American. Med. Security, Inc. v. Bartlett*, 111 F.3d 358, 364–65 (4th Cir.1996). Thus, these cases are irrelevant to a determination of whether stop loss carriers are members of ICHIA under Indiana's stat-

In *Angoff*, insurance companies and others brought an action challenging regulation promulgated by the Director of the Department of Insurance to regulate, as medical expense insurance, some stop loss coverage provided to employers with self-funded health insurance plans. The State of Missouri, in § 376.421, RSMo 1994 regulates policies of group health insurance delivered in that state. The law provides that policies meeting certain specifications may be issued. That statute also provides that other policies of group health insurance may be issued when the Director of Insurance is satisfied that the policies meet certain standards. The Missouri statutes do not purport to address stop loss coverage in any way.

Thus, in *Angoff*, the Director claimed that he had authority for a regulation, which purports to regulate certain forms of stop loss insurance by defining it and treating it as medical expense insurance, when the policy has certain features, which, as a practical matter, tend to transfer much of the risk from the employer or the plan to the insurance company. However, the court held that the Director did not have statutory authority to promulgate regulation that regulated stop loss coverage as medical expense insurance because by definition, they are excluded. Particularly, by definition, group health insurance does not provide benefits to the employer, and no policy of group health insurance is permitted to pay any benefit directly to the employer. On the other hand, stop loss insurance does benefit the employer. It is issued to an employer or the trustees of a self-funded plan to protect the employer or trust from unusual or catastrophic losses. Thus, it provides no direct benefits for any employee, or their dependents.

Likewise, the medical stop loss insurers claim that they are not members of the ICHIA because as stop loss insurers they benefit the employer, not the employee. In their capacity as stop loss insurers, the medical stop loss insurers do not provide health insurance and do not cover individual lives of the employees but rather, insure the employer's excess losses incurred on its self-insured health care plan. No payments or benefits are ever paid directly to the employee. Based upon these conditions, the medical stop loss insurers maintain that they are not covered in the definition of a health insurance provider, and therefore are not member carriers of ICHIA.

However, we find the medical stop loss insurers reliance upon *Angoff* misplaced. In particular, unlike the Missouri statute in *Angoff* that specifically excluded stop loss insurance from its ambit, Indiana's statute does not contain such exclusion. Specifically, the statutory definition of ICHIA's membership provides that all insurers who provide "medical expense incurred" policies are members of the ICHIA. *See* I.C. § 27–8–10–2.1(b), 27–8–10–1(d), (p). Clearly, this definition of ICHIA's membership is inclusive. However, the legislature did expressly exclude certain categories of insurance. Indiana Code section 27–8–10–1(p), states, in pertinent part: " '[H]ealth insurance' does not include short term travel accident policies, accident only policies, fixed indemnity policies, automobile medical payment, or incidental coverage issued with or as a supplement to liability insurance." Thus, stop loss carriers are not included within this list as being excluded from ICHIA membership.

Further, the Missouri Supreme Court has since found that "[b]y definition, stop loss coverage is a form of health insurance. Employers are directly reimbursed under

ute because they deal primarily with ERISA preemption issues.

stop loss policies for employee healthcare expenses above the expected amount of claims." *Fidelity Sec. Life Ins. Co. v. Dir. of Revenue,* 32 S.W.3d 527, 530 (Mo.2000). In *Fidelity,* the stop loss insurer sought a court determination that it was providing health insurance in order to qualify for a tax deduction, and the court held that it was. *Id.* Specifically, the court held that the stop loss policies were "policies or contracts providing health insurance benefits for the benefit of some or all of the employees of one or more employers." *Id.* Consequently, we find that medical stop loss insurers' reliance upon *Angoff* does not support their position. Given our responsibility to carry out the spirit and purpose of the statute, we conclude that the legislature intended for the medical stop loss insurers to be included as members of ICHIA. *See N.D.F.,* 775 N.E.2d at 1088.

Moreover, the record indicates that the medical stop loss insurers have paid ICHIA's assessments without objection, in some instances for 20 years or more. The Commissioner asserts that the medical stop loss insurers should not be able to argue now that they are not members of ICHIA, solely because of the change in the assessment methodology. In particular, the Commissioner argues that it is "absurd" to take the position that they are not ICHIA members, when they have paid hundreds of thousands of dollars previously, without determining or questioning their obligation to do so. (Appellee's Br. p. 20). We agree with the Commissioner. To hold otherwise would allow the medical stop loss insurers to continuously change their membership status, depending on which status fits their needs at that particular time. Likewise, we find this result absurd.

Based upon all of the above, we conclude that the trial court properly determined

that the Commissioner demonstrated a reasonable likelihood of success in proving that the medical stop loss insurers are ICHIA members. *See Norlund,* 675 N.E.2d at 1149. Accordingly, we find that the Commissioner satisfied this element in obtaining a preliminary injunction.

iv. *Injunction Outweighed by Harm*

Lastly, the trial court was required to determine whether the injury to the party seeking the injunction, *i.e.,* the Commissioner, outweighs the harm to the party who would be enjoined, *i.e.,* the medical stop loss insurers. The Commissioner argues that the trial court properly determined that the threatened injury to the Commissioner, ICHIA, and ICHIA's insureds outweighed the potential harm to the stop loss insurers. In support of its argument, the Commissioner cites to the following findings of fact issued by the trial court:

30. Although ICHIA cannot survive the [medical stop loss insurers'] nonpayment of assessments, the [medical stop loss insurers] can survive the payments of claims. The [medical stop loss insurers] have not claimed and their witnesses did not testify that the payment of ICHIA assessments would cause them to become insolvent. They have not invoked the provision of the ICHIA statute that allows them to seek an abatement or deferral through the administrative process if payment of an assessment would cause them to be unable to fulfill their contractual obligations to insureds. Ind.Code § 27–8–10–2.1(g).

31. The testimony of the [medical stop loss insurers'] witnesses showed that if they pay the assessments and there is, in the future, a final judicial determination that they overpaid or should not have paid at all, they can calculate the amounts of their economic damages.

32. The Commissioner's witnesses showed that, if there is a future, final judicial determination that the [medical stop loss insurers] are entitled to a refund of a portion or all of the assessments they have paid, then such a refund would become a financial obligation of ICHIA, would be included among its operating losses for the relevant fiscal year, and would be funded through assessments to its members.

(Appellant's App. p. 15). The record indicates that the denial of injunctive relief would have placed the approximately 9,700 Indiana residents insured by ICHIA in immediate peril. Thus, the denial of the preliminary injunction would have placed the ICHIA's insured in immediate peril. Whereas, the record is devoid of evidence where the potential economic harm to the medical stop loss insurers would be as substantial or more. In fact, the medical stop loss insurers do not argue that they are not financially able to pay or would suffer an economic loss.

Further, ICHIA is unable to avoid a cash flow crisis by reallocating the unpaid assessments among other members who are not challenging the assessments. ICHIA is required to assess all members and to do so in accordance with its plan of operation. ICHIA members who have already paid their own assessments are unlikely to willingly pay the share of the medical stop loss insurers' burden. However, the Commissioner has stated that, if there is a future, final judicial determination that the medical stop loss insurers are entitled to a refund of a portion or all of any assessments paid under protest, then such a refund would become a financial obligation of ICHIA, would properly be included among its operating losses, and would be properly funded through assessments to ICHIA members.

Accordingly, we find that the trial court properly determined that the balance of harms was "not a close question." (Appellant's App. p. 33). Consequently, we conclude that the trial court properly determined that threatened injury to the Commissioner, ICHIA, and ICHIA's insureds outweighs the potential harm to the medical stop loss insurers. *See Norlund,* 675 N.E.2d at 1149.

Based upon all of the aforementioned, we hold that the Commissioner satisfied all of the elements required to obtain injunctive relief. *See Norlund,* 675 N.E.2d at 1149. Therefore, we conclude that the trial court did not abuse its discretion in granting the Commissioner preliminary injunction. *See id.*

### III. *Notice and Hearing*

■ Lastly, the medical stop loss insurers argue that the November 2002 assessments are invalid and enforceable because they were based upon an unlawfully promulgated Plan of Operation that was not approved by the Commissioner following Notice and Hearing as required by Indiana Code section 27–8–10–2.1(c). Conversely, the Commissioner argues that she, in her capacity as a Board member and as head of the Department of Insurance, properly approved the change in ICHIA's Plan of Operation from a premiums-based assessment methodology to a claims paid-methodology and, then, to the covered lives methodology, which is at issue here.

Indiana Code section 27–8–10–2.1(c), provides, in pertinent part:

> The association shall submit to the commissioner a plan of operation for the association and any amendments to the plan necessary or suitable to assure the fair, reasonable, and equitable administration of the association. The plan of operation becomes effective upon approval in writing by the commissioner consistent with the date on which the

coverage under this chapter must be made available. The commissioner shall, after notice and hearing, approve the plan of operation if the plan is determined to be suitable to assure the fair, reasonable, and equitable administration of the association and provides for the sharing of association losses on an equitable, proportionate basis among the member carriers, health maintenance organizations, limited service health maintenance organizations, and self-insurers. The medical stop loss insurers now argue that the Commissioner failed to comply with this statute. Particularly, the medical stop loss insurers contend that adherence to the notice and hearing provision was critical in this instance, where the November 2002 Assessments were not calculated on the basis of premiums as outlined in the ICHIA statute, but on the methodology of covered lives. On the other hand, the Commissioner maintains that neither she, nor her predecessors, had ever approved a plan of operation promulgated by ICHIA following notice and hearing.

Although we agree with the medical stop loss insurers that the notice and hearing requirement must be satisfied; nevertheless, our review of the record indicates that this omission was corrected, on the Commissioner's own initiative and without complaint from any ICHIA member, before the preliminary injunction hearing. Particularly, the record discloses that in March of 2003, when the Commissioner held the hearing, the stop loss insurers participated, though counsel, and submitted written objections to the approval of the new methodology. Nonetheless, the Plan of Operation was still approved after this notice and hearing.

Further, the record discloses that the Commissioner and ICHIA have not applied the assessments retroactively, pursuant to the amended assessment methodology. As previously mentioned, the ICHIA statute requires the Board to determine actual operating losses following the close of the fiscal year, and thereafter to assess those losses to the members. *See* I.C. § 27–8–10–2.1(g). By contrast, the interim assessments made throughout ICHIA's fiscal year are optional under the statute, are made periodically based on projected cash flow needs, and are subject to later adjustment on the basis of actual facts and circumstances. This final, statutory assessment typically occurs around the first of July and is referred to as a "true-up." (Appellee's Br. p. 27). The facts before this court indicate that the revised 2002 assessment methodology, where notice was provided to the stop loss insurers, was approved by the Commissioner in full compliance with the statute before the statutory 2002 assessments were issued. Consequently, we conclude that the November 2002 assessments are valid and enforceable.

## CONCLUSION

Based on the forgoing, we conclude that the trial court did not abuse its discretion in granting the Commissioner injunctive relief, thereby ordering the medical stop loss insurers to comply with the Commissioner's final orders.

Affirmed.

DARDEN, J., and BAILEY, J., concur.