Filed 12/8/21  P. v. Mendoza CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS ANTONIO MENDOZA,<br><br>    Defendant and Appellant. | D078398<br><br><br>(Super. Ct. No. INF1600426) |

APPEAL from a judgment of the Superior Court of Riverside County, Otis Sterling, Judge.  Affirmed as modified.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A. Sevidal and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

In April 2017, an information charged defendant Carlos Mendoza with the murder of Cecelia Silva. (Pen. Code, § 187, subd. (a)).[1] The information also alleged that Mendoza committed the homicide by means of lying in wait (§ 190.2, subd. (a)(15)); and that he personally used a deadly and dangerous weapon (i.e., a knife) in its commission (§§ 12022, subd. (b)(1), 1192.7, subd. (c)(23)).

In March 2020, the jury found Mendoza guilty of first degree murder and found the special circumstance of lying in wait and the weapon enhancement true. In July 2020, the trial court sentenced him to life in prison without the possibility of parole, plus one year.

On appeal, Mendoza contends the trial court erred in admitting inculpatory statements he made to police during his interrogations, including confessing to Silva's murder. Alternatively, he contends he was prejudiced and denied due process of law when portions of his unredacted videotaped interrogations were played for the jury.

Mendoza also contends his first degree murder conviction and the true finding on the lying-in-wait special circumstance must be reversed for lack of substantial evidence; the trial court erred in refusing to privately excuse a prospective juror for cause; the prosecutor committed prejudicial error during closing by referencing the oath taken by the jury; and the fines, fees, and assessments imposed by the trial court should be stricken based on its failure to make a threshold finding of ability to pay. Finally, Mendoza contends, and the People concede, that the court erred both by imposing a parole revocation restitution fine and in calculating his presentence custody credits.

---

[1]    Further undesignated statutory references are to the Penal Code unless otherwise indicated.

In supplemental briefing, Mendoza contends that under recently enacted Assembly Bill No. 1869 (2019-2020 Reg. Session) (Stats. 2020, ch. 92, § 2) (Assem. Bill No. 1869), the booking fee imposed by the trial court under former Government Code section 29550, subdivision (c), and the presentence probation report fee under former section 1203.1b, subdivision (j) should be stricken.

As we explain, we agree with the parties that the trial court erred in imposing the parole revocation restitution fine and in calculating Mendoza's presentence custody credits. We also agree that as of July 1, 2021, the unpaid balance of the booking and presentence probation report fees are vacated. In all other respects, we affirm the judgment.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  *Events Leading Up to Silva's Murder*

Mendoza met Silva in January 2016 through a mutual friend, Ivan J. Mendoza and Silva went on their first date on January 21. The following day, Mendoza wrote in the calendar in his phone, " 'Second date at casino. Fell for her.' " Mendoza on January 26 also wrote in his calendar, " 'Cecilia and I are officially together' "; and on January 29, just eight days after their first date, " '[e]ngaged to Cecilia.' "

About a month after they met, Silva told Mendoza she wanted a break from their relationship. Toward the end of February or early March 2016, Silva began a romantic relationship with coworker Pascual M.

As a result of the breakup, Mendoza in late February 2016 went to a county mental health facility in Indio (Indio facility). Mendoza over the years had suffered from depression, and had previously attempted suicide. At the Indio facility, Mendoza was evaluated, found to be a danger to himself as a result of suicidal ideation, and placed on a 72-hour involuntary hold. (Welf.

3

& Inst., § 5150.)  When that hold expired, he was involuntarily held for about another 14 days.  (*Id.*, § 5250.)  While hospitalized, he denied hallucinating or being paranoid or delusional.  The psychiatrist who treated Mendoza found him to be "organized, linear, and goal-directed in regards to [his] thought process."  On discharge on March 9, Mendoza was diagnosed with "[m]ajor depressive disorder *without* psychotic features."  (Italics added.)

On March 17, Mendoza called Silva to say "goodbye," telling her he was going to kill himself.  A day earlier, Mendoza had gone to Ivan's home also to say his "goodbyes," asking Ivan if he wanted any of his "stuff."  Although Mendoza appeared "really sad," Ivan did not believe Mendoza was serious about committing suicide.

On March 19, the day before Silva was murdered, Mendoza sent flowers to her workplace.  Silva's coworkers testified she was very upset by the flowers.  She messaged Mendoza, " 'I don't like it when you spend.' "  Later that day, they talked on the phone for about seven minutes.  Thereafter, Mendoza messaged Ivan, " 'It's over.' "

B.    *Silva's Murder*

Silva was headed for work at about 5:00 a.m. on March 20.  Silva's neighbor, Eduardo F., was awakened early that morning by "arguing between a man and a woman."  "Maybe 30 seconds" later, Eduardo heard "very loud awful screaming" lasting a "few seconds."  Initially he thought the yelling and screaming had been a nightmare.  Less than a minute later, he went outside, quickly looked around, but did not see anything.

At 5:24 a.m. that morning, Mendoza messaged Ivan he was " 'going back to the mental place.' "  Ivan's cousin, who worked at the Indio facility, called Ivan a little later that morning, telling him to " '[g]et over here' " as Mendoza was outside the facility.  When Ivan contacted Mendoza, he

4

appeared "out of it."  Ivan also observed Mendoza was not wearing any shoes, which he found "very weird [b]ecause . . . every time—and even my family noticed that [h]e always had his super clean K-Swiss white shoes, always clean.  At that time, he wasn't wearing his shoes, which was very awkward."  Because the Indio facility was full, Mendoza was ultimately admitted at Canyon Ridge Hospital in Chino (Canyon Ridge).

      C.     *The Police Investigation*

Riverside County Deputy Sheriff Dennis Klemme was dispatched to Silva's home at 6:25 a.m. on March 20.  He found the driveway chain-link fence and gate locked, and saw a female, later identified as Silva, lying in a pool of blood in the driveway next to a car with its engine running.  Deputy Klemme estimated the fence was about six to eight feet high.

After the scene was secured, Deputy Klemme noticed bloody footprints near Silva's body.  It appeared someone wearing only socks had stepped in the blood because it was possible to see the outlines of the toes and some fibers in the footprints.  About nine such footprints were found at the murder scene.

An autopsy was performed on Silva on March 21.  It showed she had suffered about 46 stab and incise wounds, including 11 wounds to her head and neck, with the fatal wound severing her jugular vein and carotid artery.

The day after Silva's murder, police executed a validly issued search warrant at the home of Mendoza's parents, where he had been living.  Officers observed a portion of the home's garage had been converted into a "martial arts studio," and inside the studio they found a rubber "training knife" on a shelf.  Inside Mendoza's bedroom, they found a receipt for flowers Mendoza had sent Silva; a note in a lunch box with a heart written next to

5

Silva's name; several knives; and a mask similar to the one worn by "Bane," a character from a Batman movie.

Two days after Silva's murder, police served a validly issued search warrant on Mendoza while he was hospitalized at Canyon Ridge. Officers took evidentiary swabs from Mendoza, and seized among other items his clothing and cell phone. Content from Mendoza's cell phone revealed that late on the afternoon of March 16 he messaged Silva that he knew why she did not want to see him anymore, and telling her " 'goodbye.' " When Silva responded, " 'Where are you going?' " Mendoza messaged, " 'I'm not going to wake up.' "

## II.     DISCUSSION

A.     *Suppression of Mendoza's Postarrest Statements to Police*

1.     Voluntariness

a)     *Events Prior to the Confession*

Pursuant to a validly issued warrant, police arrested Mendoza for Silva's murder at 5:15 p.m. on Tuesday, April 5, 2016, while he was hospitalized at Canyon Ridge, and transported him to the police station. Prior to interrogating him that evening, former Riverside County Sheriff's Department Detective Sean Freeman read Mendoza his rights under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Mendoza acknowledged receiving those rights and voluntarily agreed to speak with Freeman and Detective Nelson Gomez. During the interrogation, Mendoza denied murdering Silva, and claimed he could not remember what occurred in the hours leading up to her murder because of a "blackout" he had experienced due to his mental condition.

During the interrogation, Mendoza also claimed to having memory lapses and hearing "voices" in his head, and noted he had been recently

6

hospitalized at the Indio facility for depression and suicidal ideation. Because of these mental health issues, arrangements were made for a neuropsychologist to meet with Mendoza the following morning. Freeman informed Mendoza of this meeting during the interrogation, which ended after midnight. The officers then transported Mendoza to a Riverside jail for booking.

At about 9:00 a.m. the following morning, the detectives brought Mendoza back to the police station. He again was given *Miranda* warnings and, as he had done the night before, he voluntarily agreed to speak with the detectives. They then introduced Mendoza to Dr. Martha Rogers, a forensic neuropsychologist.

Dr. Rogers told Mendoza that she had been asked to meet with him because during the interrogation the night before, he claimed he was experiencing blackouts, memory problems, hallucinations, and reported "feeling suicidal." She explained she had been a neuropsychologist for about 35 years, specializing in the study of "brain and behavior relationships where people are having problems such as learning disorders or memory loss or head injuries." She further explained that it was his choice, and his alone, whether to go forward with the examination, at one point telling him, "You don't have to talk to me." She also told him because he "did not have an attorney assigned to him," it might "be better for him to wait" to be evaluated because the "advantage" would be the testing and results of the testing would be "confidential." She stated that if he agreed to the exam, she would seek to obtain "reliabl[e]" information based on the testing and data, and her conclusions would not be "slant[ed]" for one side or the other.

Although the detectives had told Mendoza the examination would be private, Dr. Rogers was clear that there was no "private doctor/patient

7

relationship" between her and Mendoza; and therefore, that anything he said would be shared with law enforcement and the district attorney's office, and nothing would be kept "confidential." She also explained that if he consented to the examination, she would prepare a written report that also would not be confidential. Mendoza agreed to go forward with the hours-long examination, which involved a series of tests.

The detectives watched the examination from another room. Once completed, Dr. Rogers concluded it was "highly likely" Mendoza was "exaggerating his psychiatric complaints." She found his memory function was "pretty good," he was "not experiencing memory loss that was measurable or findable," and his blackouts were likely alcohol-related. Dr. Rogers first shared her conclusions with the detectives, then with Mendoza.

After the examination, the detectives confronted Mendoza, telling him they did not believe "his story" about having a blackout in the hours leading up to Silva's murder. Mendoza asked for a cigarette break "before he went down that road." After taking as "much time" as he needed, Mendoza confessed to the murder.

b) *The Confession*

Mendoza told the detectives that Silva ended their relationship once and for all during their seven-minute telephone conversation on Saturday, March 19, when she told him about Pascual. Mendoza claimed this was the first time he had learned Silva was romantically involved with someone else. After speaking with Silva and messaging Ivan that his relationship with Silva was "over," he packed a bag that included five pairs of socks, five pairs of underwear, seven T-shirts, two pairs of jeans, razors and shave gel, deodorant, and a blanket, among other items. He also packed a large knife in his bag.

Mendoza told the detectives later that night he drove around for a while.  He then was wearing a black T-shirt, blue jeans, and white shoes.  As he drove, Mendoza heard voices in his head telling him to kill Silva, because if he couldn't have her, nobody else could.  He knew Silva worked at 5:00 a.m. on Sundays.  Feeling "out of control," he drove to the area where Silva lived and parked around the corner from her home.  He then was wearing black nylon sweats, a black "hoodie," tennis shoes, gloves, and a black neoprene "Bane" face covering.  Carrying the sheathed knife he had packed, he walked to Silva's home, "jumped the fence and waited" on the south side of the property, under a covered patio area.  While he waited for Silva, he unsheathed the knife, and took off his shoes because they were "making too much noise."

Mendoza in "socked feet" next "ran up" to Silva as she headed to work, after she had exited her car to unlock the driveway gate.  Feeling as though he was on "autopilot," Mendoza attacked her with the knife.  Silva screamed for her mother two or three times but otherwise said nothing.  Mendoza was unsure if Silva recognized him because it was dark and his face was covered.

After the attack, Mendoza ran back to the patio area where he had been "hiding," grabbed the knife sheath and his shoes, jumped back over the locked gate, and returned to his car.  He took off the clothes and shoes he had worn in the attack, including his mask and gloves, and placed them along with the knife in a black plastic bag.  Wearing just his "boxer[]" underwear, he drove to an irrigation canal, scraped his feet in the "dirt" to remove any blood, and threw the plastic bag containing the articles of clothing and the

9

knife into the water.[2]  Dressed in clean clothes but without shoes, he then drove to the Indio facility where he had been recently hospitalized.  At some point later that day, Mendoza learned from Ivan that Silva was dead.

After confessing to the murder, Mendoza wrote a letter of apology to Silva's family.  Mendoza also apologized to the detectives for being untruthful during the previous night's interrogation, adding, "I can't lie.  I won't lie to you guys.  You guys are doing your job.  You guys are treating me very well, and I can't do this to you guys and I can't do this to [Silva]."  Mendoza was arraigned on Friday, April 8 for Silva's murder.

c)      *Admission of Mendoza's Confession*

Mendoza filed a motion in limine to exclude the inculpatory statements he made after his arrest on April 5 and his confession on April 6.[3]  He argued under the totality of the circumstances that his statements were involuntary based on the coercive nature of the detectives' interrogations.  He separately argued that his April 6 confession should be suppressed because the state violated the California Constitution and section 825 by unreasonably delaying his arraignment.

The People filed their own in limine motion seeking to admit Mendoza's incriminating statements and the letter he wrote to Silva's family.

---

[2]      The plastic bag and its contents were subsequently recovered by a sheriff's department dive team.

[3]      Mendoza also moved to suppress statements he made to police on March 22, 2016, when police executed the search warrant and questioned him without first giving him *Miranda* warnings.  The court ruled Mendoza's March 22 statements violated *Miranda* and thus were involuntary, which ruling is not the subject of this appeal.

Prior to ruling on the parties' competing motions, the court held an Evidence Code section 402 hearing.[4] Freeman was the only witness to testify at the hearing. During the hearing, Freeman described his first contact with Mendoza at the hospital on March 22, noting Mendoza then appeared "semi-incoherent" and claimed he was "dizzy" and "having trouble standing." Freeman, however, believed Mendoza was "faking his level of incoherence" and symptoms.

Freeman's next contact with Mendoza was on April 5, the night of his arrest. During that interrogation, Mendoza was given multiple breaks, including to use the bathroom and to smoke cigarettes. He denied murdering Silva, but "left open [the possibility] that he could have done it[,] but had no memory of it" due to his experiencing a blackout.

The following day Mendoza was transported back to the police station, introduced to Dr. Rogers, and subsequently confessed to Silva's murder. Near the conclusion of the lengthy Evidence Code section 402 hearing, Freeman on cross-examination stated he had no knowledge why Mendoza had not been arraigned on April 6. This was the only question posed to Freeman regarding the timing of Mendoza's arraignment.

After the witness testimony and oral argument of counsel, the court ruled Mendoza's statements were voluntary and not the result of police coercion. The court found that Mendoza received *Miranda* warnings before each interrogation, and that he "clearly waived [those] rights by answering in

---

[4] Subdivision (b) of Evidence Code section 402 provides: "The court may hear and determine the question of the admissibility of evidence out of the presence or hearing of the jury; but in a criminal action, the court shall hear and determine the question of the admissibility of a confession or admission of the defendant out of the presence and hearing of the jury if any party so requests."

11

the affirmative that he understood his rights and then proceeded to offer whatever information he offered" during the interrogations.

The court next addressed the examination of Mendoza by Dr. Rogers, noting: "She clearly laid out his options for him. I do understand that, apparently, there was some discussion about the private discussion Mr. Mendoza was going to have with the doctor. That clearly was cleared up with him by the doctor when she told him, 'This will not be confidential. Whatever information you provide to me is going to go to the District Attorney; it's going to go to law enforcement; it's going to go to your attorney. This is not confidential. This is not, quote, "private." ' She informed him, 'Your options are talk to me now, don't talk to me. Make the best decision for yourself.' And Mr. Mendoza agreed to speak to her."

The court found the duration of the interrogations was not excessive, and during both, Mendoza was given multiple breaks and provided with food and water. The court summarized its ruling as follows: "So considering the totality of the circumstances relat[ing] to the interviews on April 5th, April 6th—the fact that he was Mirandized; the fact that he was told that it wasn't a confidential—it wasn't going to be a private interview with the doctor; that the information would go to all involved parties; the duration; the breaks; the tone; and the tactics were not overly bearing such that this Court can say that his subsequent statements were involuntary."

After making its ruling, trial counsel asked the court to address whether Mendoza's detention was unlawful because of the timing of his arraignment. The court confirmed Mendoza was arraigned within 48 hours. Counsel argued the arraignment, while within the statutorily prescribed 48 hours (discussed *post*), was nonetheless unreasonably delayed. In rejecting

12

this argument, the court stated it had in fact considered the timing of Mendoza's arraignment in finding his confession was voluntary.

d)     *Guiding Principles*

An involuntary confession is not admissible evidence.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1176 (*Linton*); *People v. Neal* (2003) 31 Cal.4th 63, 79 (*Neal*) ["It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion."].)  "The test for determining whether a confession is voluntary is whether the defendant's 'will was overborne at the time he confessed.' "  (*People v. Maury* (2003) 30 Cal.4th 342, 404, quoting *Lynumn v. Illinois* (1963) 372 U.S. 528, 534.)  A confession is involuntary if " ' "extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." ' "  (*Linton*, at p. 1176.)  In determining the voluntariness of a confession, relevant factors include " ' " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " '  [Citation.]  No single factor is dispositive."  (*People v. Winbush* (2017) 2 Cal.5th 402, 452.)

Moreover, a confession is involuntary only if the coercive police conduct is "causally related" to a later confession.  (*People v. Williams* (2010) 49 Cal.4th 405, 437 (*Williams*).)  It must be a " 'motivating cause of the decision to confess.' "  (*People v. Wall* (2017) 3 Cal.5th 1048, 1066 (*Wall*).)

When a defendant challenges the admission of a statement on the grounds that it was involuntarily made, the state bears the burden of showing by a preponderance of the evidence that a defendant's statement

13

was, in fact, voluntary. (See *People v. Battle* (2021) 11 Cal.5th 749, 790; *Linton, supra,* 56 Cal.4th at p. 1176.) " 'On appeal, we conduct an independent review of the trial court's legal determination' as to the voluntariness of a confession. [Citation.] Although we rely on the trial court's factual findings to the extent they are supported by substantial evidence, where, as here, '[t]he facts surrounding an admission or confession are undisputed to the extent the interview is tape-recorded,' those facts as well as the ultimate legal question are 'subject to our independent review.' " (*Wall, supra,* 3 Cal.5th at p. 1066.)

e)      *Analysis*

Mendoza on appeal makes a series of arguments regarding the alleged coercive tactics police used during the interrogations that either singularly or collectively rendered his statements and confession involuntary. We have independently reviewed the transcripts of the April 5 and 6 interrogations. For the reasons we discuss, we conclude from the totality of the circumstances that Mendoza's statements on April 5 and his confession on April 6 were voluntary and not, as he contends, the product of coercive interrogation tactics by police. (See *Wall, supra,* 3 Cal.5th at p. 1066.)

(i) Interrogation and Mendoza's Mental Health

Primary among Mendoza's involuntariness argument is his contention that the detectives "exploited" his "severe mental disorder" during the interrogations, including when they introduced him to "their agent," Dr. Rogers, and when Freeman gave false information that he had a brother who, like Mendoza, also suffered from depression.

First, we conclude Mendoza was given sufficient information by Dr. Rogers to make a knowing and intelligent decision whether to submit to the examination, after claiming he had a blackout and expressing suicidal

14

ideation. As pointed out by the trial court and as shown by our independent review of the record, Dr. Rogers specifically told Mendoza that it was up to him whether to go forward with the evaluation and that, *if* he decided to do so, anything he said would be shared with law enforcement and the district attorney's office. Thus, while the detectives had previously told Mendoza that his evaluation with Dr. Rogers would be private, the record shows Dr. Rogers clearly disavowed him of this, when she stated there was no "private doctor/patient relationship" between them and nothing he said would remain "confidential."

Second, we note the lack of any evidence in the record suggesting that Dr. Rogers's examination of Mendoza was in any way biased or "slanted," or that her findings and conclusions were not the result of an objective and neutral assessment. Although Mendoza refers to Dr. Rogers as the detectives' "agent," there is scant evidence in the record to support such a finding.

Third, although Mendoza states he was suffering from a "severe mental disorder" when he was interrogated by the detectives and evaluated by Dr. Rogers, the record belies this assertion. As noted, Dr. Rogers determined it was "highly likely" that Mendoza was "exaggerating his psychiatric complaints" and he was "not experiencing memory loss that was measurable or findable." In addition, while hospitalized at the Indio facility just days before the murder, Mendoza's treating physician found him to be "organized, linear, and goal-directed" in his "thought process"; and on discharge, diagnosed Mendoza with "depressive disorder *without* psychotic features." (Italics added.)

Contrary to Mendoza's assertions, there was sufficient evidence for the court to conclude Mendoza was not suffering from a "severe mental disorder"

when he was interrogated and met with Dr. Rogers, but instead he was being less than truthful about not remembering the events leading up to the murder. This evidence also supports the conclusion Mendoza's decision to confess was an exercise of free will and not the result of coercive police tactics that allegedly "exploited" his mental illness.

Fourth, we conclude Mendoza's confession was not involuntary as a result of false information Freeman gave about his brother also suffering from depression, in an effort to build a rapport with Mendoza. Police may use deceptive tactics, but "[s]o long as a police officer's misrepresentations or omissions are not of a kind likely to produce a *false* confession, confessions prompted by deception are admissible in evidence." (*People v. Chutan* (1999) 72 Cal.App.4th 1276, 1280; see *People v. Thompson* (1990) 50 Cal.3d 134, 167 [false claims that police had found soil samples, car tracks, and rope fibers connecting the suspect to the murder did not invalidate confession]; *People v. Mays* (2009) 174 Cal.App.4th 156, 166 [fake polygraph examination was not likely to produce false confession when the defendant asked for the exam].) Viewing Freeman's statement about his brother under the totality of the circumstances test, we cannot say this false information was likely to produce a false confession. (See *Chutan*, at p. 1280 [noting that "subterfuge is not necessarily coercive," and that "[p]olice officers are thus at liberty to utilize deceptive stratagems to trick a guilty person into confessing"].)

(ii) Other Interrogation Tactics Used by the Detectives

Mendoza also relies on several other "ploys" or "tactics" he contends the detectives unlawfully employed to render his statements and confession involuntary.

One such tactic is what Mendoza refers to as "maximization-minimization" ploy. According to Mendoza, under this "technique the

16

interrogator convinces the suspect that his denials are futile, and his only chance to save himself is to admit to a seemingly mitigated version of events, which the detective proffers." For support, Mendoza relies on *In re Elias V.* (2015) 237 Cal.App.4th 568 (*Elias V.*).

Unlike the instant case, *Elias V.* involved the interrogation of a *13-year-old* juvenile who allegedly had sexually molested a three-year-old child. (*Elias V.*, *supra*, 237 Cal.App.4th at p. 571.) The *Elias V.* court found the police interrogation of the juvenile to be "dominating, unyielding, and intimidating" (*id.* at p. 586), and was "precisely the sort of forced-choice" questioning "that can easily induce an *adolescent* . . . to falsely incriminate himself when confronted with false evidence of his guilt." (*Id.* at p. 589, italics added.) *Elias V.* thus does not inform our analysis in this case.

Mendoza also contends the detectives' statements that this was his "last chance" to "tell the truth" were coercive. However, " 'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. "[W]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct," the subsequent statement will not be considered involuntarily made.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 115 (*Holloway*); accord, *People v. Carrington* (2009) 47 Cal.4th 145, 170-172 (*Carrington*) [concluding an officer may extoll the psychological or moral benefits of telling the truth]; *People v. Davis* (2009) 46 Cal.4th 539, 600 (*Davis*) [concluding an officer's exhortation to " 'get it all out in the open' " and to get everything " 'off [his] chest' " did not render a defendant's subsequent confession involuntary].)

Nor do we find persuasive the cases Mendoza relies on to show police coercion in making what he contends are similar types of pronouncements. (See, e.g., *Neal*, *supra*, 31 Cal.4th at pp. 63, 68 [finding the confession of an 18-year-old defendant of *limited education and low intelligence* involuntary after his interrogator deliberately violated *Miranda* by continuing to question and badger the defendant, despite the defendant's request during the interrogation to speak with an attorney *nine* times and his invocation of the right to remain silent]; *United States v. Anderson* (2d Cir. 1991) 929 F.2d 96, 97 [affirming the district court's suppression of a defendant's statement based on a *Miranda* violation when, after the defendant had been Mirandized but prior to making a statement, a government agent repeatedly told him, " 'this [is] the time to talk to us, because once you tell us you want an attorney we're not able to talk to you and as far as I [am] concerned, we probably would not go to the U.S. Attorney or anyone else to tell them how much [you] cooperated with us' "]; and *Commonwealth v. Novo* (2004) 812 N.E.2d 116 [finding the defendant's confession involuntary after his interrogators told him at least 12 times that, if he did not give them a reason for his conduct a jury would never hear it, thereby implicating the defendant's right to present a defense in a subsequent criminal trial].)

Mendoza also contends the detectives made an implied threat of harsher punishment by stating that a jury would not believe his story about having a blackout before Silva's murder, and that it instead would view him as a "monster," or words to this effect, unless he confessed to the crime. However, the detectives' statements about how a jury might perceive him did not include the possibility that he would be punished less severely if he confessed. As noted, mere exhortation by police for a defendant to "tell the truth," without an express or implied promise of leniency, is not a deceptive

18

practice that renders the defendant's attending statements involuntary. (See *Davis*, *supra*, 46 Cal.4th at p. 600; *Holloway*, *supra*, 33 Cal.4th at p. 115; see also *Williams*, *supra*, 49 Cal.4th at p. 444 [no impropriety by the police "in pointing out that a jury probably [would] be more favorably impressed by a confession and a show of remorse than by demonstrably false denials"]; accord, *Carrington*, *supra*, 47 Cal.4th at p. 174 [officers may comment on the realities of a suspect's position and the choices available to him, including by informing the suspect that "full cooperation might be beneficial in an unspecified way"]; cf. *People v. Cahill* (1994) 22 Cal.App.4th 296, 314 [finding involuntary the confession of a young defendant when an investigator provided a detailed discussion of California law and unmistakably conveyed a clear, false message that the defendant could avoid being "tried for first degree murder" and the death penalty if "he admitted that he was inside the house and denied that he had premeditated the killing."].)

Viewing these and the other statements of the detectives under the totality of the circumstances test, we conclude they do not support Mendoza's claim that his confession was involuntary as a result of police coercion. (See *Neal*, *supra*, 31 Cal.4th at p. 79 ["voluntariness does not turn on any one fact, no matter how apparently significant, but rather on the 'totality of [the] circumstances' "].)

### 2. Illegal Detention

Mendoza separately contends the trial court erred in not excluding his April 6 confession because he allegedly was not arraigned in a timely manner.

### a) *Guiding Principles*

The California Constitution requires arraignment of a person "without unnecessary delay." (Cal. Const., art. 1, § 14.)

Similarly, section 825 states in relevant part: "(a)(1) Except as provided in paragraph (2), the defendant shall in all cases be taken before the magistrate without unnecessary delay, and, in any event, within 48 hours after his or her arrest, excluding Sundays and holidays." Subdivision (a)(2) of this statute further states in part: "When the 48 hours prescribed by paragraph (1) expire at a time when the court in which the magistrate is sitting is not in session, that time shall be extended to include the duration of the next court session on the judicial day immediately following."

b)    *Analysis*

Mendoza does not dispute that under section 825 he was arraigned within 48 hours of his arrest. The record shows he was arrested on Tuesday, April 5, at 5:15 p.m. when the court was no longer "in session." (See § 825, subd. (a)(2).) Therefore, the time frame for his arraignment was extended "to include the duration of the next court session on the judicial day immediately following" his arrest, or Wednesday, April 6 (see *ibid.*); and he was in fact arraigned on Friday, April 8.

Mendoza nonetheless claims that his arraignment was unreasonably delayed, and that this delay was prejudicial because he should have been arraigned on April 6, the day after his arrest. He further claims that, "but for" the delay in his arraignment, he would not have confessed to Silva's murder.

There is no evidence to support Mendoza's claim he could have been arraigned on April 6. Mendoza's arrest on April 5 came after the court was closed and thus no longer "in session" within the meaning of section 825, subdivision (a)(2), and he was not booked until well after midnight. No evidence was presented to show the court could have included him on either the morning or afternoon arraignment calendars on April 6. Because the

20

record is silent on this issue, any finding he could have been arraigned on April 6 would be purely speculative. (See *People v. Hord* (1993) 15 Cal.App.4th 711, 725 [" 'Where the alleged misconduct is entirely speculative in nature, it is settled that the denial of a constitutional right resulting in essential unfairness must be established as a demonstrable reality, not as a matter of speculation.' "].)

Mendoza also asserts his arraignment was unreasonably delayed when the police allegedly engaged in improper investigation tactics to purposely delay his arraignment on April 6. During the Evidence Code section 402 hearing, Freeman stated the purpose of having Dr. Rogers interview Mendoza was to "obtain information" and to "assist in [the] investigation." Mendoza claims these statements establish the delay in his arraignment was unreasonable because he confessed to the murder on April 6 during the second interrogation. Citing among other cases *People v. Pettingill* (1978) 21 Cal.3d 231 (*Pettingill*) and *People v. Powell* (1967) 67 Cal.2d 32 (*Powell*), Mendoza asserts that because he denied murdering Silva in his April 5th postarrest interview, the officers were obligated to cease any further interrogation of him, either directly or indirectly.

In *Pettingill*, the defendant and three companions were arrested for burglary at 10 p.m. on a Saturday by Officer Berry of the Eureka Police Department. The defendant was Mirandized, and, after acknowledging such rights, *refused* to speak with Officer Berry. Two hours later, Berry "renewed the interrogation of defendant at the Eureka police station. The officer readvised defendant of his *Miranda* rights and 'asked him again if he wished to make a statement . . . .' Again defendant replied that he did not want to talk to the police, and he was transferred to the county jail." (*Pettingill, supra*, 21 Cal.3d at p. 235.)

21

Three days after his arrest, a detective from the Santa Barbara Police Department initiated a third interrogation of the defendant, despite the fact there had been no indication in the interim that the defendant had changed his mind and wanted to talk to police and the detective knew the defendant had twice invoked his right to remain silent. After telling the defendant that all three of his companions had confessed to various burglaries in Santa Barbara and had implicated him in those crimes, the detective again read the "defendant his *Miranda* rights, established that he understood them, and asked if defendant wanted to talk to him. This time defendant replied, 'I guess so, yeah.'" (*Pettingill*, *supra*, 21 Cal.3d at p. 236.) Thereafter the defendant confessed to the burglaries.

The Supreme Court in *Pettingill* found the defendant's confession violated *Miranda* and his privilege against self-incrimination, and thus was inadmissible. (*Pettingill*, *supra*, 21 Cal.3d at p. 237.) The court also rejected the People's argument that the defendant's confession was sufficiently attenuated to render the waiver valid. The court found this delay was not "psychologically beneficial or even neutral," but instead put more pressure on the defendant to confess to "end his isolation from family, friends, or counsel." (*Id.* at p. 242.) It was within this context that the *Pettingill* court cited to section 825 and the constitutional provisions of California law requiring "a person arrested for or charged with crime be taken before a magistrate 'without unnecessary delay.'" (*Pettingill*, at p. 242.)

*Pettingill* does not inform our analysis in this case. Unlike the defendant there, Mendoza freely agreed to speak with the officers after receiving *Miranda* warnings on April 5. He also freely agreed to speak with

Dr. Rogers after also receiving *Miranda* warnings on April 6, after she obtained his informed consent to the examination.[5]

In addition, *Pettingill* is also factually distinguishable because in the instant case the officers brought Mendoza back to the police station to meet with Dr. Rogers as a result of mental health complaints *he* raised during the previous night's interrogation, including expressing suicidal ideation, following his arrest that same night at *a mental health* hospital where he had been undergoing treatment for about two weeks. The officers also knew that just days prior to Silva's murder, Mendoza had been hospitalized for about two weeks, after being placed on an involuntary hold due to similar mental health concerns; and that in the days leading up to the homicide, he had informed both Silva and Ivan of his intent to commit suicide.

Under these circumstances, we cannot say it was unreasonable or improper for the officers to have Mendoza evaluated by Dr. Rogers on April 6 to address his mental health issues. Thus, Mendoza has failed to show "there was an essential connection between the [alleged] illegal detention and admissions of guilt," or that his will was overcome when he was asked to speak with Dr. Rogers and then confessed. (See *People v. Richardson* (2008) 43 Cal.4th 959, 991, superseded by statute on another ground as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509.)

In any event, even assuming the delay in Mendoza's arraignment was unreasonable, this is merely one of many factors we must consider in

---

[5] For reasons similar to *Pettingill*, we find *Powell* inapposite. There, the Supreme Court found the incriminating statements of the defendants were inadmissible after they were held in custody for three days prior to arraignment, were subjected to repeated interrogations, and (pre-*Miranda*) were not adequately warned of their right to remain silent and the right to counsel. (*Powell*, *supra*, 67 Cal.2d at pp. 58-60.)

determining whether Mendoza's confession was voluntary. (See *People v. Thompson* (1980) 27 Cal.3d 303, 329 (*Thompson*) [recognizing "[a] delay in arraignment is treated 'as only one of the factors to be considered in determining whether the statement was voluntarily made' "].) We cannot say any purported delay in Mendoza's arraignment rendered his confession involuntary, particularly in light of the fact that, after being given *Miranda* warnings before both of his interrogations on April 5 and 6, he did *not* invoke any such rights including the right to remain silent, but instead freely spoke with the detectives and Dr. Rogers. Under these circumstances, even if section 825 were violated, that would not render his confession involuntary. (See *Thompson*, at p. 309.)

> B.     *Admission of the Detectives' Statements During the Interrogations*
> > 1.     Events Before Trial

After the court found Mendoza's confession admissible, his counsel complained that certain statements by the detectives during the videotaped interrogations were objectionable. The court suggested the parties review the videotape (and accompanying transcript) and attempt to reach agreement on whether to redact any material before it ruled on any specific objections.

The parties met and conferred and trial counsel thereafter made eight objections to the April 5 interrogation, all of which involved statements by the detectives that Silva had a four-year-old daughter. Counsel argued these statements were irrelevant and highly prejudicial. The prosecutor disagreed, arguing these statements were relevant and not unduly prejudicial, and were not to be considered for the truth of the matter asserted but rather only for Mendoza's "response[s] to the [detectives'] investigatory and interviewing techniques." The court agreed with the People, ruling: "In all instances, the Court does not feel that it is more prejudicial than it is probative. It places a

24

lot of the defendant's answers in context. Most of it is clearly techniques on the part of the officers to try to get Mr. Mendoza to discuss what happened, and I think the jury would see it that way."

### 2. Events During Trial

Outside the presence of the jury, trial counsel renewed his objection to a statement by one of the detectives during the interrogation about Silva having a young daughter. Claiming the remark was not only unduly prejudicial but also constituted inadmissible hearsay, counsel asked the court to admonish the jury that *all* questions and statements by the detectives throughout the interrogations were not evidence. The court took the matter under submission, noting it had never "admonished a jury with regard to questions and/or statements made by an investigator during the course of [his or her] interview with the suspect."

The following day, the court stated it would not admonish the jury as trial counsel had requested, but instead would give counsel "as much time and as much leeway" as he needed in questioning Freeman "to clarify for the jury what is accurate, what isn't accurate, [and] what is a tactic" that was used during Mendoza's interrogations. When counsel again suggested that an "easy solution to the problem" was for the court merely to admonish the jury that *all* of the detectives' questions and remarks were not evidence, the trial court responded, "It would be easy to do that, but, also, it may be confusing."

The record shows during cross-examination, Freeman was asked a series of questions about the interrogations. He admitted at some points giving Mendoza false information, and questioning Mendoza using such information. Thereafter, the court agreed to admonish the jury regarding Freeman's statements that they had heard from others that Silva felt

25

Mendoza was " 'suffocating' " her in their relationship; and that Mendoza's ex-wife believed he was responsible for the murder (or words to that effect).

The court admonished the jury as follows:

"Ladies and gentlemen, we did hear a videotape of an interview that was conducted with Mr. Mendoza. One of the interviews was with regard to an interview on April 5th. During the course of the interview, there were certain statements that were made by Investigator Freeman to Mr. Mendoza. Certain of those statements are not being admitted for the truth contained in the statement, but only its effect on Mr. Mendoza and his answer. Those statements are the following:

"During the course of the interview, Investigator Freeman indicated that he had spoken to numerous people that [Silva] told that she got flowers delivered to her and that she told a person right next to her, 'This guy's suffocating me. I'm not into him anymore.' That is not being admitted for the truth contained in that statement, but only its effect on Mr. Mendoza, if any.

"During the course of the interview, there was also a portion in the interview in which Investigator Freeman indicated that he had spoken to Mr. Mendoza's ex[-wife], that the ex[-wife] also said that some of the things that Mr. Mendoza did or showed to [Silva], that he showed to her, and that she absolutely believes that he did that. That, also, is not being admitted for the truth contained in the statement from Mr. Mendoza's ex[-wife], but only its effect on Mr. Mendoza, if any."

### 3. Guiding Principles

Under Evidence Code section 350, "[n]o evidence is admissible except relevant evidence." " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) A trial court may not

26

admit irrelevant evidence, but it has broad discretion in determining whether evidence is relevant. (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.) "When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' the probative value, the objection must be overruled." (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 (*Cudjo*).)

" 'Prejudice,' as used in Evidence Code section 352, is not synonymous with 'damaging.' [Citation.] Rather, it refers to evidence that uniquely tends to evoke an emotional bias against the defendant as an individual, and has little to do with the legal issues raised in the trial." (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1095.) "A trial court's exercise of discretion in admitting or excluding evidence is reviewable for abuse [citation] and will not be disturbed except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

        4.     Analysis

We conclude the trial court did not abuse its discretion when it initially overruled Mendoza's eight objections to the detectives' statements about Silva having a young daughter. These statements along with the others by the detectives were properly admitted for the nonhearsay purpose of giving context to Mendoza's responses, if any, during the interrogations. (See *People v. Maciel* (2013) 57 Cal.4th 482, 524 (*Maciel*) [concluding that, contrary to the defendant's assertion, "the officers' statements that defendant had 'set . . . up' the murders in this case" "served the nonhearsay purpose of giving context to defendant's responses."].)

27

Moreover, we conclude the probative value of these statements was not substantially outweighed by the possibility their admission would be unduly prejudicial to Mendoza. (See *Cudjo*, *supra*, 6 Cal.4th at p. 609.) We note that during the interrogations Mendoza himself talked about Silva having a daughter, including when he confessed to the murder and said there was nothing he could do to bring Silva "back" for her.

We also conclude the trial court properly exercised its broad discretion when it refused to admonish the jury that *all* of the detectives' statements during the interrogations were not evidence. As noted, their statements neither constituted inadmissible hearsay nor were they unduly prejudicial. (See *Maciel*, *supra*, 57 Cal.4th at p. 524; *Cudjo*, *supra*, 6 Cal.4th at p. 609.) And, we agree with the court that such an instruction could have been "confusing"; that the jury, in any event, would have understood the detectives' statements in the context of which they were made—to obtain information; and therefore, that it was not reasonably likely the jury would have considered any such statements as bearing on the issue of guilt, particularly after Freeman admitted on cross-examination using various tactics—including giving false information—to get Mendoza to talk. (See *Maciel*, at p. 524.)[6]

C.    *Substantial Evidence Supports the Lying-in-Wait Special Circumstance*

The prosecution presented two theories of Mendoza's guilt of first degree murder: premeditated, deliberate murder; and murder by means of

---

[6]    In light of our decision on the merits of this issue, we find it unnecessary to address Mendoza's contention that he received ineffective assistance based on his counsel's failure to object to these and other statements by the detectives during the playback of the videotaped interrogation.

28

lying in wait. As noted, Mendoza was also charged with the special circumstance of lying-in-wait. (§ 190.2, subd. (a)(15).) The jury found Mendoza guilty of first degree murder without indicating the theory, and, as noted, found true the special circumstance of lying in wait.

Mendoza contends the testimony of Eduardo F., Silva's neighbor, establishes that Mendoza was not lying in wait when he killed Silva. According to Mendoza, the gap of about 30 seconds between the sounds of a man and a woman arguing and a woman screaming, ostensibly when the attack commenced, meant there was no evidence of a "surprise attack on an unsuspecting victim," as required by lying-in-wait murder and the special circumstance.

### 1. Standard of Review

In assessing the sufficiency of the evidence supporting a criminal conviction, this court must " 'examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Guerra* (2006) 37 Cal.4th 1067, 1129.) "In determining whether a reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt, we presume in support of the judgment ' "the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Nelson* (2016) 1 Cal.5th 513, 550.) "When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal of the judgment." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1069 (*Mendoza*).)

29

In reviewing for substantial evidence, "[w]e neither reweigh the evidence nor reevaluate the credibility of witnesses." (*People v. Jennings* (2010) 50 Cal.4th 616, 638.) "Resolution of conflicts and inconsistences in the testimony is the exclusive province of the trier of fact." (*People v. Young* (2005) 34 Cal.4th 1149, 1181.) "Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction." (*Ibid.*)

### 2. Guiding Principles

"The requirements of lying in wait for first degree murder under . . . section 189 are 'slightly different' from the lying-in-wait special circumstance under . . . section 190.2, subdivision (a)(15). [Citation.] . . . We focus on the special circumstance because it contains the more stringent requirements. [Citation.] If, as we find, the evidence supports the special circumstance, it necessarily supports the theory of first degree murder. [¶] The lying-in-wait special circumstance requires 'an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. . . .' [Citations.] 'The element of concealment is satisfied by a showing " 'that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim.' " ' " (*People v. Carpenter* (1997) 15 Cal.4th 312, 388, (*Carpenter*); see *People v. Cage* (2015) 62 Cal.4th 256, 278 (*Cage*) [noting the " 'lying-in-wait special circumstance requires intent to kill, while lying-in-wait murder requires only a wanton and reckless intent to inflict injury likely to cause death,' " and therefore, "[w]here the

30

evidence supports the special circumstance, it necessarily supports the theory of first degree murder"].)

" 'We have explained the elements of the lying-in-wait special circumstance as follows. " ' "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " [Citation.]' " [Citation.] As for the watching and waiting element, the purpose of this requirement "is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' [Citation.]" [Citation.] "The factors of concealing murderous intent, and striking from a position of advantage and surprise, 'are the hallmark of a murder by lying in wait.' " ' " (*Cage*, *supra*, 62 Cal.4th at p. 278.)

3. Analysis

Mendoza does not argue there is a lack of substantial evidence to support the jury's findings that he "intended to kill" Silva, or its findings on the elements of "concealment of purpose" and "watching and waiting" for purposes of lying-in-wait. (See *Cage*, *supra*, 62 Cal.4th at p. 278.) And for good reason; based on the evidence from his confession summarized *ante*, substantial evidence supports each of these findings. Instead, he contends there is no substantial evidence to support the finding he launched a "surprise attack on an unsuspecting victim." We disagree.

First, Mendoza himself stated that he did not say anything to Silva, much less that they had argued as Eduardo testified, when he *ran* up to her from his place of hiding and, wearing all black clothing and a black face

31

covering, attacked her in the darkness at about 5:00 a.m., after she had exited her car to unlock the driveway gate. Mendoza also stated that Silva only cried out for her mother about three times as he attacked; and that he was not even sure Silva recognized him as her attacker, given it was dark and his face was covered. From this evidence, a rational jury could find that Mendoza "made a surprise attack" on Silva "from a position of advantage." (See *Cage*, *supra*, 62 Cal.4th at p. 278.)

That Eduardo heard arguing between a man and woman just seconds before hearing a loud scream suggests at most a conflict in the evidence regarding whether Mendoza "surprised" Silva. As a court of review, we do not reweigh the evidence or the credibility of the witnesses and make new or contrary findings if the jury's findings are supported by substantial evidence, which, as we have found, is the case here. (See *Mendoza, supra*, 52 Cal.4th at p. 1069.)

Second, even crediting Eduardo's testimony that there was some arguing between Mendoza and Silva about 30 seconds before he heard Silva scream, a rational jury could nonetheless find that Mendoza's attack "surprised" Silva. For one thing, Eduardo could not recall what was said during the argument, and thus, whether Silva even recognized Mendoza as her attacker. For another thing, the attack followed within seconds after the arguing, and the attack occurred inside a locked gate, which Deputy Klemme estimated was about six to eight feet tall. A rational jury could deduce from this evidence that Silva was startled when confronted by Mendoza, particularly given the early hour of the attack, and that his actions "met the requirement of an immediate attack on unsuspecting victim[ ] from a position of advantage." (*Cage, supra*, 62 Cal.4th at p. 280 [noting a "several minute[ ]" delay between the time the defendant used a ruse to persuade the victim to

open the front door and the time he shot her and another occupant of the house supported not only the watching and waiting element of lying in wait, but also the "surprise" element of this special circumstance]; contra, *People v. Thomas* (1945) 25 Cal.2d 880, 889 [reversing a first degree murder conviction based on the theory of lying in wait because the evidence *conclusively* established that the defendant walked up and confronted his wife, whom he believed was cheating on him, with no attempt whatsoever to conceal his attack against her, and which attack, the court found, arose out of "hot anger" and occurred "without reflection"].)

Because substantial evidence supports the jury's true finding on the lying-in-wait special circumstance, which has more stringent requirements than lying-in-wait first degree murder, by necessity we also reject his claim there is insufficient evidence to support his first degree murder conviction based on this same theory. (See *Cage*, *supra*, 62 Cal.4th at p. 278 ["[w]here the evidence supports the special circumstance, it necessarily supports the theory of first degree murder"]; *Carpenter*, *supra*, 15 Cal.4th at p. 388 [same].)

### D. *Refusal to Excuse a Prospective Juror*

Mendoza next contends the court erred when it refused during voir dire to excuse a retired superior court judge for cause. He further contends this error was compounded because the court required him to exercise a peremptory challenge in front of the remaining jury pool, despite his request the prospective juror be privately excused.

#### 1. Additional Background

During voir dire, one of the prospective jurors identified himself as a retired judge from Riverside County. The retired judge nonetheless stated he could be fair and impartial if left on the jury. The trial judge disclosed the

retired judge had been his former supervisor and mentor. It appears neither the trial judge nor the retired judge nor the parties recalled that the retired judge had actually presided over Mendoza's preliminary hearing about three years earlier.

Outside the presence of the prospective jurors, trial counsel asked the court to excuse the retired judge for cause. When the court found there was no reason to do so (again, not realizing the retired judge had presided over Mendoza's preliminary hearing), counsel stated he was willing to use one of his several remaining peremptory challenges to excuse the retired judge, but asked that it be done privately to avoid any potential prejudice to Mendoza.

The court rejected this request, ruling: "I don't think that can be avoided, unfortunately. Retired Judge E[.], he is a citizen and, you know, hasn't demonstrated any basis to excuse him for cause. So I think at this point we have to leave it to you folks to decide who is a good fit and exercise your peremptories based on, obviously, reasons outside of . . . biases and things of that nature concerning . . . issues you can't take into consideration. But beyond that, I think I have to leave it up to you guys."

When the proceedings recommenced, the court excused three prospective jurors for cause, and then the parties alternated in exercising two of their peremptory challenges, including one by the defense excusing the retired judge from the panel.

### 2. Guiding Principles

Code of Civil Procedure section 225, which also applies to criminal cases, provides for challenges by a party to individual potential jurors for cause on certain grounds. It states: "A challenge is an objection made to the trial jurors that may be taken by any party to the action, and is of the following classes and types: [¶] . . . [¶] (b) A challenge to a prospective juror

34

by either: [¶] (1) A challenge for cause, for one of the following reasons: [¶] (A) General disqualification—that the juror is disqualified from serving in the action on trial. [¶] (B) Implied bias—as, when the existence of the facts as ascertained, in judgment of law disqualifies the juror. [¶] (C) Actual bias—the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party. [¶] (2) A peremptory challenge to a prospective juror." (Code Civ. Proc., § 225.)

Code of Civil Procedure section 229 sets forth the only causes for which a potential juror may be challenged for implied bias, including, as relevant here: "(e) Having an unqualified opinion or belief as to the merits of the action founded on knowledge of its material facts or some of them." (Code Civ. Proc., § 229, subd. (e).)

"Assessing the qualifications of jurors challenged for cause is a matter falling within the broad discretion of the trial court. [Citation.] The trial court must determine whether the prospective juror will be 'unable to faithfully and impartially apply the law in the case.' " (*People v. Weaver* (2001) 26 Cal.4th 876, 910 (*Weaver*).) A trial court is in the best position to determine whether a potential juror is sincerely willing and able to listen to the evidence and the instructions, and render an impartial verdict based on that evidence and those instructions. (*People v. Hillhouse* (2002) 27 Cal.4th 469, 488-489 (*Hillhouse*).) "A reviewing court must allow the trial court to make this sort of determination. The trial court is present and able to observe the juror itself. It can judge the person's sincerity and actual state of mind far more reliably than an appellate court reviewing only a cold transcript." (*Ibid*.)

### 3. Analysis

We conclude the court did not abuse its discretion when it refused to excuse the retired judge for cause. First, it is clear from the record that the trial judge did not know, nor did the retired judge and/or the parties recall, that about three years earlier the retired judge had presided over Mendoza's preliminary hearing. Importantly, that was never disclosed to prospective jurors during voir dire. Absent such knowledge, we cannot say the court abused its discretion when it found the retired judge could be fair and impartial. (See *Hillhouse*, *supra*, 27 Cal.4th at pp. 488-489; *Weaver*, *supra*, 26 Cal.4th at p. 910.)

Second, in light of the information then available, the court could reasonably believe the retired judge could decide the case based on the evidence and instructions presented at trial and provide Mendoza a fair trial. The trial court was in a far better position than this court to determine the actual states of mind of the potential jurors, including the retired judge, because of its ability to directly view them and hear their statements on voir dire. (See *Hillhouse*, *supra*, 27 Cal.4th at pp. 488-489.)

Mendoza nonetheless contends the court erred by not allowing trial counsel to privately exercise a peremptory challenge which, he further contends, prejudiced him in front of the remaining jury pool. We note, however, that the retired judge himself stated during voir dire that he had never sat on a jury, adding, "Big surprise, huh?" and, "I have a lot of what I consider to be close friends that are judges, attorneys. And then I have a lot of people that I am acquainted with that have appeared before me." Thus, the potential prejudice to Mendoza was minimal if nonexistent because the retired judge himself recognized that, although believing he was qualified to sit as a juror in this case, it was unlikely he would remain on the panel.

Finally, even assuming the court erred in denying Mendoza's challenge for cause to the retired judge and/or in refusing to allow him to exercise his peremptory challenge privately, we would nevertheless conclude Mendoza has not carried his burden to show he was denied a right to a fair and impartial jury. (*People v. Crittenden* (1994) 9 Cal.4th 83, 121 ["If a defendant contends that the trial court wrongly denied a challenge for cause, he or she must demonstrate that the right to a fair and impartial jury thereby was affected," and that to do so, "a defendant must establish that he or she exercised a peremptory challenge to remove the juror in question, exhausted the defendant's peremptory challenges, and communicated to the trial court the defendant's dissatisfaction with the jury selected"].)

Although Mendoza was required to use one of his peremptory challenges to excuse the retired judge from the panel, he had others remaining, and he does not contend an incompetent juror was forced on him. (See *People v. Yeoman* (2003) 31 Cal.4th 93, 114 [refusing to address the defendant's claim he was deprived of a fair trial when his challenge to four prospective jurors for cause was denied and he was required to use peremptory challenges that he eventually exhausted because the defendant could not show prejudice, concluding "[n]one of the four prospective jurors could possibly have affected the jury's fairness because none sat on the jury."].) Nor did Mendoza then express dissatisfaction with the constitution of the final jury. (Cf. *Weaver, supra,* 26 Cal.4th at p. 911.)

Here, Mendoza did not carry his burden to show that any of the final jurors had an implied or actual bias against him. All of the jurors stated they could be fair and impartial and make their decisions based on the evidence and instructions presented at trial. Mendoza therefore was not prejudiced by any alleged error by the court in either denying his challenge to the retired

judge for cause or requiring him to exercise a peremptory challenge in front of the remaining jurors. (See *People v. Hawkins* (1995) 10 Cal.4th 920, 939, disapproved on another ground as stated in *People v. Lasko* (2000) 23 Cal.4th 101, 110.)

      E.    *Prosecutorial Error*

      1.    Additional Background

During closing, trial counsel argued that Mendoza "is guilty of a murder, but he's not guilty of murder with premeditation and deliberation. He's not guilty of murder by lying in wait. And he's not guilty of the special allegation of lying in wait with the intent to kill someone by surprise. And he's also guilty of second-degree murder with a knife." Later, counsel argued, "We're not saying that he didn't kill her, and we're not saying that he's not guilty of murder, but he did not premeditate or deliberate this murder. He did not carefully plan any of this stuff."

Immediately thereafter, the prosecutor in rebuttal argued: "[W]hen you took your oath as jurors, you promised to consider all of the evidence in this case. And in order to find for second-degree murder, you would have to disregard so much evidence in this case, and that's not the oath you took, that's not the job you do as jurors. [¶] You would have to disregard motive. You'd have to disregard his actions. You'd have to disregard his words. Take his confession completely out. Just completely disregard it. You would have to take out the rational nature of how the crime was carried out. Disregard that. You have to disregard the packed bag to go to mental health. All the goal[-]directed behavior that made sense for how he envisioned and wanted to commit the crime. You have to disregard his motivation to feign symptoms of mental illness—hearing voices and psychosis—to come to a decision of second-degree murder. Again, your job as jurors is to consider *all the*

*evidence.* And disregarding all these things would not be a true and trust[ed] verdict." (Italics added.)

Mendoza contends the prosecutor's argument constituted prejudicial misconduct because it suggested the jury was required to find him guilty of first degree murder merely as a result of the oath of impartiality taken by jurors. He further contends that, to the extent the issue is forfeited based on his counsel's failure to object, his counsel was ineffective.

### 2. Forfeiture

As a preliminary matter, we agree with the People that Mendoza forfeited his claim of alleged prosecutorial error because he failed to " 'make a timely and specific objection and ask the trial court to admonish the jury to disregard the impropriety. [Citations.]' " (*People v. Clark* (2011) 52 Cal.4th 856, 960, quoting *People v. Cole* (2004) 33 Cal.4th 1158, 1201 (*Cole*); see also *People v. Dennis* (1998) 17 Cal.4th 468, 521 (*Dennis*).)

However, even if Mendoza's contention was not forfeited, we would deny it on the merits.[7]

### 3. Guiding Principles

"A prosecutor's misconduct violates the Fourteenth Amendment to the United States Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct that does not render a trial fundamentally unfair nevertheless violates California

---

7   In light of our decision to reach the merits of this issue, we deem it unnecessary to decide whether Mendoza's counsel was ineffective for failing to object to this portion of the prosecutor's rebuttal argument.

law if it involves 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*Cole, supra,* 33 Cal.4th at p. 1202.)

Prosecutors have wide latitude during closing argument to argue vigorously. (*People v. Harrison* (2005) 35 Cal.4th 208, 244 (*Harrison*).) We will not reverse a conviction for prosecutorial misconduct "unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct." (*People v. Crew* (2003) 31 Cal.4th 822, 839 (*Crew*).) "When the issue 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*Harrison,* at p. 244.) We "view the statements in the context of the argument as a whole." (*Cole, supra,* 33 Cal.4th at p. 1203.) We review de novo a defendant's claim of prosecutorial misconduct. (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860.)

      4.     Analysis

Although perhaps inartfully stated, when viewed in context, the prosecutor's comment in rebuttal that the jury took an oath to consider "all the evidence," and therefore, should return a first degree murder conviction, was merely a response to counsel's argument that Mendoza did not premeditate or deliberate when he committed the homicide. In making these statements, the prosecutor nonetheless reminded the jury that its "job" was to reach a "true and trust[ed] verdict" based on the *entirety* of the evidence.

In addition, we note the jury was specifically instructed with CALCRIM No. 104, which states in part: "Nothing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence." We presume, in the absence of evidence to the contrary, that the jury understands and follows

instructions from the trial court. (*People v. Fauber* (1992) 2 Cal.4th 792, 823.) We also presume that jurors treat the court's instructions as statements of law, and the arguments of the prosecutor as words spoken by an advocate merely in an attempt to persuade. (*People v. Thornton* (2007) 41 Cal.4th 391, 441.)

In light of CALCRIM No. 104 and the vigorous argument during closing regarding whether Mendoza was guilty of first or second degree murder, we conclude no reasonable juror would have construed the complained-of remark of the prosecutor as mandating he or she was required to find Mendoza guilty of first degree murder merely based on the oath of impartiality. (See *People v. Wilson* (2005) 36 Cal.4th 309, 338 [noting a court of review will not " ' "lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements' "]; see also *People v. McDaniel* (1976) 16 Cal.3d 156, 177 [concluding that a prosecutor's argument that "posed to the jury the proposition that if defendant did not commit the crime, who did?" was not improper and noting, "that even otherwise prejudicial prosecutorial argument, when made within proper limits in *rebuttal* to arguments of defense counsel, do not constitute misconduct"] (italics added).)

Moreover, even assuming the prosecutor's remark was error, we further conclude that error was not prejudicial. First, we conclude that error did not render Mendoza's trial fundamentally unfair. (See *People v. Gionis* (1995) 9 Cal.4th 1196, 1214-1215 [noting federal constitutional rights are implicated if the prosecutor's conduct renders the trial so fundamentally unfair that due process is violated].) Second, given the overwhelming evidence of guilt, we conclude it is not reasonably probable that a result more favorable to Mendoza would have been reached absent the prosecutor's alleged error. (See

41

*Crew, supra*, 31 Cal.4th at p. 839; *People v. Milner* (1988) 45 Cal.3d 227, 245, disapproved on another ground as stated in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13.)

F.      *Correction of Sentencing Errors*

Mendoza contends, and the People concede, that the parole revocation restitution fine imposed and suspended by the court pursuant to section 1202.45[8] must be stricken because he is serving a sentence that does not include a period of parole.  (See *People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6 [noting because the defendant was serving a life sentence without the possibility of parole, the parole revocation restitution fine, even if suspended, is "unauthorized and must be stricken"].)  We agree the parole revocation restitution fine must be stricken.

Mendoza also contends he is entitled to 56 additional days of presentence credit.  The People also concede this issue.  We agree with the parties and conclude Mendoza should be awarded 56 additional days of credit, based on his arrest date of April 5, 2016, and his sentencing date of July 24, 2020 (i.e., 1572 days, and not 1516 as awarded by the trial court).

G.      *Fines, Fees, and Assessments*

1.      Restitution Fine

Mendoza contends the trial court erred in imposing the statutory maximum $10,000 restitution fine.  (See § 1202.4, subd. (b)(1).)  At sentencing, trial counsel asked the trial court to stay imposition of this fine—

---

[8]      Subdivision (a) of section 1202.45 provides:  "In every case where a person is convicted of a crime and his or her sentence *includes a period of parole*, the court shall, at the time of imposing the restitution fine pursuant to subdivision (b) of Section 1202.4, assess an additional parole revocation restitution fine in the same amount as that imposed pursuant to subdivision (b) of Section 1202.4."  (Italics added.)

as well as others, including two that, as discussed *post,* are the subject of the parties' supplemental briefing, arguing Mendoza had no ability to pay. The record shows the trial court denied the stay, and ruled if Mendoza wanted an ability to pay hearing, he should file a "formal" motion with "financial services."9

### a)    *Guiding Principles*

Section 1202.4, subdivision (b) governs restitution fines. It states in part: "In every case where a person is convicted of a crime, the court shall impose a separate and additional restitution fine, unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. [¶] (1) The restitution fine shall be set at the discretion of the court and commensurate with the seriousness of the offense. If the person is convicted of a felony, the fine shall not be less than three hundred dollars ($300) and not more than ten thousand dollars ($10,000)." (§ 1202.4, subd. (b)(1).) Subdivision (b)(2) of section 1202.4 states: "In setting a felony restitution fine, the court may determine the amount of the fine as the product of the minimum fine pursuant to paragraph (1) multiplied by the number of years of imprisonment the defendant is ordered to serve, multiplied by the number of felony counts of which the defendant is convicted."

Section 1202.4, subdivision (c) states: "The court shall impose the restitution fine unless it finds compelling and extraordinary reasons for not doing so and states those reasons on the record. A defendant's inability to pay shall not be considered a compelling and extraordinary reason not to

---

9    The record is silent regarding whether Mendoza made such a formal request through "financial services."

impose a restitution fine. Inability to pay may be considered only in increasing the amount of the restitution fine in excess of the minimum fine pursuant to paragraph (1) of subdivision (b)."

In the instant case, there was no showing of "compelling and extraordinary reasons" for not imposing a restitution fine. (§ 1202.4, subds. (b), (c).) While under section 1202.4, subdivision (c), inability to pay may be considered when imposing restitution above the $300 minimum fine, inability to pay alone is not determinative.

b) *Analysis*

Mendoza argues he does not have the ability to pay the $10,000 restitution fine because he is serving a life sentence without the possibility of parole. However, at sentencing Mendoza did not present any *evidence* of his inability to pay, despite the fact it is *his* burden to make this showing. (See § 1202.4, subd. (d); *People v. Castellano* (2019) 33 Cal.App.5th 485, 490 ["a defendant must . . . contest in the trial court his or her ability to pay the fines, fees and assessments . . . and at a hearing present evidence of his or her inability to pay the amounts contemplated by the trial court"].) Moreover, he was aware before sentencing that probation was recommending imposition of the maximum restitution fine.

As the People correctly recognize, the evaluation of ability to pay must include future ability to pay and may take into account wages that a defendant may earn in prison. (*People v. Cowan* (2020) 47 Cal.App.5th 32, 49; *People v. Kopp* (2019) 38 Cal.App.5th 47, 96, review granted Nov. 13, 2019, S257844; accord § 1202.4, subd. (d).) Maximum monthly wages for prison inmates range from $12 to $56, and the Department of Corrections and Rehabilitation (Department) will deduct up to half of those wages to pay any outstanding restitution fines. (§ 2085.5, subd. (a); Cal. Code Regs., tit.

15, § 3041.2, subd. (a)(1); see *People v. Lowery* (2020) 43 Cal.App.5th 1046, 1060.)

At the time of his sentencing, Mendoza was 41 years old, "in good physical and mental health," and denied having "any pre-existing physical conditions." Thus, despite his claim to the contrary, Mendoza's ability to earn prison wages while serving a life sentence without the possibility of parole supports the tacit finding of the court of his ability to pay the maximum restitution fine.

That the trial court did not make express findings concerning Mendoza's ability to pay does *not* mean it failed to consider this factor. (See § 1202.4, subd. (d) [stating in part: "Express findings by the court as to the factors bearing on the amount of the fine shall not be required."]; *People v. Nelson* (2011) 51 Cal.4th 198, 227 (*Nelson*) [rejecting the defendant's contention the trial court erred in failing to consider ability to pay when imposing a $10,000 restitution fine, noting that the defendant " 'points to no evidence in the record supporting his inability to pay, beyond the bare fact of his impending incarceration,' " and that, because "the trial court was not obligated to make express findings concerning his ability to pay, the absence of any findings does not demonstrate it failed to consider this factor' "], quoting *People v. Gamache* (2010) 48 Cal.4th 347, 409 (*Gamache*).)

Finally, factors other than ability to pay supported imposition of the $10,000 fine in this case. (See § 1202.4 (d) [providing a court in setting the amount of the fine above the statutory minimum may also consider the "seriousness and gravity of the offense and the circumstances of its commission," and "intangible losses" "such as the psychological harm caused by the crime"].)

Here, prior to imposing the $10,000 fine, the court noted it had presided over the trial, heard and considered the victim impact statements from Silva's family, and recognized there were "no less than 21 people [in the courtroom] in support of" Silva. The court found Mendoza made the "choice" to kill Silva; the killing was "cold," "calculated," "completely heartless and undeterred"; the intent to "kill was vicious" and the killing "inhumane"; and the killing by "lying in wait" was an act of cowardice.

In light of the seriousness of the offense, the circumstances surrounding its commission, and the resulting psychological harm to Silva's family and friends as a result of her murder, and based on the formula suggested for setting a restitution fine (see § 1202.4, subd. (b)(2) [the product of $300 multiplied by the number of years of imprisonment of the defendant]), we cannot say the court abused its discretion in imposing the maximum restitution fine in this case. (See *Nelson*, *supra*, 51 Cal.4th at p. 227; *Gamache*, *supra*, 48 Cal.4th at p. 409.)[10]

       2.    Booking and Presentence Probation Report Fees

At Mendoza's July 2020 sentencing, the trial court also imposed a $514.58 booking fee (Gov. Code, § 29550) and a presentence probation report fee (former § 1203.1b, subd. (j)). While this appeal was pending, the Governor signed Assembly Bill No. 1869 into law. Effective July 1, 2021, newly enacted Assembly Bill No. 1869 eliminates many fines, fees, and assessment under an array of statutes.

---

[10] Our conclusion that Mendoza has the ability to pay the $10,000 restitution fine through prison wages also supports the tacit finding he has the ability to pay the $40 court security fee (§ 1465.8) and the $30 criminal conviction assessment (Gov. Code, § 70373).

The parties filed supplemental briefs addressing the impact of Assembly Bill No. 1869 in this case. The People concede that any portion of the booking and presentence probation report fees that were outstanding as of July 1, 2021 must be vacated. Mendoza, however, appears to contend that, because his conviction was not final when the statutory changes went into effect, the two fees should be stricken in their entirety. We agree with the People.

As this court recently explained in *People v. Lopez-Vinck* (2021) 68 Cal.App.5th 945, 953-954 (*Lopez-Vinck*): "Pursuant to the express terms of [Government Code] section 6111, subdivision (a), [a defendant] is entitled to the vacatur of that portion of the . . . fee [subject to Assem. Bill No. 1869] . . . that remains unpaid as of July 1, 2021, and to the modification of his [or her] judgment consistent with such vacatur. Section 6111, subdivision (a) [of the Government Code] provides not only that any costs imposed pursuant to the listed statutory provisions that remain unpaid on and after July 1, 2021 are 'unenforceable and uncollectible,' but also that 'any portion of a judgment imposing those costs *shall be vacated*.' [Citation.] Thus, by its express terms, [Government Code] section 6111 envisions that the referenced costs are to be vacated, and it makes the vacatur mandatory through its use of the word 'shall.' [Citation.] Although [this statute's] reference to 'those costs' is ambiguous, in that 'those costs' could refer to the entirety of the fee imposed by the trial court [subject to Assem. Bill No. 1869], such that the vacating of 'those costs' would eliminate the fee in its entirety, we conclude that the statutory scheme supports interpreting the phrase 'those costs' as referring only to that portion of [the] fee imposed by the court that remains *unpaid* as of July 1, 2021."

We find the reasoning of *Lopez-Vinck* persuasive and adopt it in this case.  We therefore vacate any remaining balance of the booking and the presentence probation report fees as of July 1, 2021.

## III.   DISPOSITION

The unpaid balance of the $514.58 booking fee and the presentence probation report fee outstanding as of July 1, 2021, are vacated.  The $10,000 parole revocation restitution fine is stricken and Mendoza is entitled to an award of 56 additional days of presentence custody credit.  The clerk of the superior court is directed to amend the abstract of judgment accordingly and forward a copy of the amended abstract of judgment to the Department.  As amended, the judgment is affirmed.


HALLER, Acting P. J.

WE CONCUR:


AARON, J.


GUERRERO, J.